[No. A097032. First Dist., Div. Two. Jan. 28, 2003.]

DAVID RIVERO, Plaintiff and Respondent, v.
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, et al., Defendants and Appellants.

**COUNSEL**

Cathy L. Arias; Richard A. Chavez; Burnham Brown; Rothner, Segall & Greenstone, Glenn Rothner, Emma Leheny and Ricardo Ochoa for Defendants and Appellants.

Law Office of William Campisi, Jr., and William Campisi, Jr., for Plaintiff and Respondent.

**OPINION**

**HAERLE, Acting P. J.—**

### I. INTRODUCTION

David Rivero sued numerous individuals and entities, including the American Federation of State, County and Municipal Employees, AFL-CIO, and its Local 3299 (collectively the Union). He charged the Union with libel, slander, conspiracy to libel, intentional infliction of emotional distress, and intentional and negligent interference with economic relationship. The Union filed a special motion to strike pursuant to Code of Civil Procedure section 425.16,[1] commonly called the anti-SLAPP statute (see *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d

---

[1]Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

507, 52 P.3d 685] (*Equilon*)).[2] The trial court denied the motion and the Union appealed. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Rivero filed this action on November 14, 2000. He later twice amended his complaint. Rivero's most recent complaint alleges in relevant part as follows: In November 1999,[3] Rivero was a supervisor of janitors at the International House on the campus of the University of California at Berkeley and had been for approximately 18 years.

During October and the beginning of November, Rivero was absent from work due to an industrial injury. While he was absent, three of the employees he supervised accused him of theft, extortion and favoritism. On November 15, Rivero attempted to return to work after his convalescence, but was informed that he was suspended from work and would remain suspended while the allegations of wrongdoing were investigated. In approximately March 2000, it was found that the allegations of wrongdoing could not be substantiated. Rivero's position as supervisor was nevertheless terminated and he was assigned to the position of dishwasher and pot scrubber in the kitchen at the International House. Rivero refused to accept this position and was terminated.

As to the Union's part in these affairs, Rivero alleged that the Union distributed three documents containing false information. The first document, distributed in May 2000, was an "AFSCME Local 3299 UC Contract Campaign News," which contained an article entitled "Custodians Suspend Supervisor!" The article stated, "Fed up with a supervisor who solicited bribes, hired family members and practiced favoritism, custodians at UCB's International House decided enough was enough. [¶] Energized by the example of UCLA workers who took action late last year, the custodians confronted their manager as a group. They had facts and evidence in hand, and convinced management to suspend the supervisor on the spot. [¶] I-House custodians wasted no time in tackling another problem: they were the only workers required to punch a time clock. They presented the issue to management and the time clock came down. It's about time!"

The second document of which Rivero complained was distributed in November and bore the title "We Suspended Our Supervisor!" The text of

---

[2]SLAPP is an acronym for "strategic lawsuits against public participation." (See *Equilon, supra,* 29 Cal.4th 53, 57.)

[3]Unless otherwise indicated, all further dates refer to 1999.

the document was as follows: "The janitors at the International House were victims of constant mistreatment, disrespect, and abuse from management. [¶] Their custodial supervisor was hiring family members and harassing hard working employees. He was unfair, abusive, and playing favorites. [¶] Although the janitors repeatedly asked management for justice, U.C. refused to solve the problem. So the workers decided to organize and take action. [¶] On November 15, . . . the janitors marched into management and declared they would no longer work under their abusive supervisor. [¶] Because of the janitors' courage and unity, management was forced to suspend the custodial supervisor, and the janitors have pledged to make sure he doesn't return. [¶] Let's Take Action! [¶] Let's Get Organized! [¶] Let's build a strong union at U.C. Berkeley!"[4] The center bottom of the flier contained the following message in small text: "We are building a strong union at U.C. Berkeley. To join call (510) 663-3939 Ext. 25."

The third document, prepared in November or December, principally contained space for people to print and sign their name and indicate their "Room Number." Above this section were the words: "Stand Up for Justice! [¶] The custodians of the International House at U.C. Berkeley were victims of constant mistreatment, disrespect, and abuse from management. Custodians say their supervisor was even soliciting bribes. [¶] We the undersigned demand an end to management's pattern of abuse and support the custodian's fight for fairness and respect."

Rivero charged the Union with libel and slander, conspiracy to libel, intentional infliction of emotional distress, and intentional and negligent interference with economic relationship. The Union filed a special motion to strike pursuant to section 425.16. The Union argued that section 425.16 applied to Rivero's claims because "[t]he conduct at issue here is speech regarding the working conditions of International House employees supervised by [Rivero]. Such conduct is clearly in furtherance of expression concerning a labor dispute, and thus protected by the U.S. Constitution. [Citation.]" The Union further argued that Rivero had not met his burden of demonstrating a probability of prevailing on his claims against the Union. Rivero opposed the motion.

The trial court denied the Union's motion. In a 24-page order, the court concluded (1) the Union had not met its burden of establishing that Rivero's

---

[4]At oral argument, counsel for the local union explained that the local had lost 15,000 of its 32,000 members to another union. The local union started a campaign to ensure that this loss of membership did not happen again and to improve representation of the remaining 17,000 members.

allegations arose from " 'conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest' " and (2) Rivero met his burden of establishing a probability of prevailing on his claims.

## III. DISCUSSION

### A. *Section 425.16*

Section 425.16 provides, in relevant part, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) ■ Courts have interpreted this language as creating a "two-step process for determining whether an action is a SLAPP." (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*); *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 455 [125 Cal.Rptr.2d 534] (*Davis Committee*).)

In the first step, "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' . . . ." (*Equilon, supra,* 29 Cal.4th at p. 67.) Section 425.16, subdivision (e), defines an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " as including "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) The Legislature has directed that the courts construe this language broadly. (§ 425.16, subd. (a).)

If the defendant meets this burden of demonstrating that the complaint comes within the provisions of section 425.16, the burden then shifts to plaintiff to demonstrate a probability that he or she will prevail on the claim. (§ 425.16, subd. (b); *Equilon, supra,* 29 Cal.4th at p. 67.) "[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citations.]" (*Navellier, supra,* 29 Cal.4th at p. 88.) In sum, " '[t]he defendant has the burden on the first issue, the threshold issue; the plaintiff has the burden on the second issue. [Citation.]' [Citation.]" (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928 [116 Cal.Rptr.2d 187].)

■ "On appeal we review independently whether the complaint against the appellant arises from appellant's exercise of a valid right to free speech and petition and if so, whether the respondent established a probability of prevailing on the complaint. [Citation.]" (*Davis Committee, supra,* 102 Cal.App.4th at p. 456.)

## B. *The Public Issue Requirement*

■ The Union contends that Rivero's allegations fall into the last category of section 425.16, subdivision (e), because its alleged conduct was "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (See § 425.16, subd. (e)(4).) The Union offers several theories to support its contentions. For one, the Union argues that the "abusive supervision of employees throughout the University of California system is an issue of particular public interest because it impacts a community of public employees numbering 17,000." For another, the Union contends that unlawful workplace activity is a matter of public interest particularly where it occurs at a publicly financed institution.

Few published cases have interpreted the terms "public issue" and "public interest" as they are used in section 425.16, subdivision (e). *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 [102 Cal.Rptr.2d 205] (*Damon*) is one case that has interpreted those terms. In *Damon*, a dispute had arisen between many residents of Leisure Village, a planned development residential community for seniors, and its general manager, Dennis E. Damon. (*Id.* at pp. 471-472.) The residents of Leisure Village were "members of the Ocean Hills Country Club Homeowners Association (Association), which [was] governed by a seven-member elected board of directors

(Board)." (*Id.* at p. 471.) The Village Voice newsletter, which was published by a private homeowners club and circulated to members of the Association and local businesses, criticized Damon's competency to manage the Association and urged residents to replace Damon with a professional management company. (*Id.* at p. 472.) The rift grew and, following a failed effort to recall Board members who supported Damon's removal, Damon notified the Association that he did not intend to renew his contract. (*Id.* at pp. 472-473.)

Damon then filed a defamation complaint against six Association members who had authored letters or articles published in the Village Voice criticizing his performance, the two Board members who had supported his removal and the Association club that published the Village Voice. (*Damon, supra,* 85 Cal.App.4th at p. 473.) The defendants moved to strike Damon's complaint under section 425.16 and the trial court granted the motion. (*Damon,* at p. 473.)

In affirming the trial court's decision, the appellate court considered whether the topics of the allegedly defamatory statements concerned " 'issue[s] of public interest.' " (*Damon, supra,* 85 Cal.App.4th at p. 478.) The court explained that "[t]he definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]" (*Id.* at p. 479.)

The appellate court concluded that the allegedly defamatory statements concerned a public issue. (*Damon, supra,* 85 Cal.App.4th at pp. 479-480.) First, the court explained that the alleged statements "concerned the very manner in which this group of more than 3,000 individuals would be governed—an inherently political question of vital importance to each individual and to the community as a whole. [Citation.]" (*Id.* at p. 479.)

Second, the court noted that the "statements were made in connection with the Board elections and recall campaigns. 'The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. "Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment." ' [Citations.]" (*Damon, supra,* 85 Cal.App.4th at p. 479.) The court concluded that "[a]lthough the allegedly defamatory statements were made in connection with the management of a private homeowners association, they concerned issues of critical importance to a large segment of our local

population. 'For many Californians, the homeowners association functions as a second municipal government . . . .' [Citation.] Given the size of the Ocean Hills community, the nature of the challenged statements as involving fundamental choices regarding future management and leadership of the Association, and our Legislature's mandate that homeowner association boards be treated similar to governmental entities, the alleged defamatory comments involved 'public issues' within the meaning of the anti-SLAPP statute. [Citation.]" (*Damon, supra,* 85 Cal.App.4th at pp. 479-480.)

In *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226 [83 Cal.Rptr.2d 677] (*Sipple*), Division Two of the Second District also considered the question of what constitutes a "public issue." The plaintiff in that action, Donald Sipple, was a nationally known political consultant who had developed campaign themes for his clients that included the prevention and punishment of domestic violence and other crimes against women. (*Id.* at p. 230.) In 1997, Mother Jones magazine published an article focusing on a 1992 custody dispute between Sipple and his first wife, Regina, in which Regina and Sipple's second wife, Deborah, each testified that Sipple had physically and verbally abused them. (*Ibid.*) The author of the article confirmed the wife-beating allegations by interviewing people who knew the women. (*Id.* at p. 238.)

Sipple filed a complaint for various causes of action, including libel, against Mother Jones and the author of the article. (*Sipple, supra,* 71 Cal.App.4th at pp. 230-231.) The defendants filed a motion to strike the complaint pursuant to section 425.16 and the trial court granted the motion. (*Sipple,* at p. 231.)

Sipple appealed, arguing in part that his treatment of his previous wives was not a public issue within the meaning of section 425.16. (*Sipple, supra,* 71 Cal.App.4th at p. 236.) The appellate court disagreed, concluding "that the details of [Sipple's] career and [his] ability to capitalize on domestic violence issues in his advertising campaigns for politicians known around the world, while allegedly committing violence against his former wives, are public issues . . . ." (*Id.* at pp. 239-240.) The court explained that "[c]entral to the article, of course, are the allegations of physical and verbal abuse against a prominent media strategist by two former wives . . . . According to the record, [Sipple], a top figure in national politics, has been interviewed by the press and profiled in the media scores of times. In 1994, [Sipple] devised media strategy based on gender-based advertising against domestic violence for the gubernatorial races of Pete Wilson in California, George W. Bush in Texas and Jim Edgar in Illinois. Ironically, the custody dispute

occurred while [Sipple] was running the media strategy for Bob Dole's 1996 presidential campaign based on morality issues. In other words, [Sipple] was able to capitalize on domestic violence issues in order to further his career." (*Id.* at p. 238.) The court also explained that "[t]he article's theme that rich and powerful men may use the legal system to their advantage over women who may have been abused by them is further exposition on the same issue of domestic violence. An example of [Sipple]'s ability to use his influence was the appearance of Missouri Supreme Court Chief Justice Chip Robertson at the custody hearing [where he testified on Sipple's behalf]. . . . Thus, like it or not, [Sipple] injected himself into the controversy by using his influential position and his ready access to the press to define crime and violence as central issues in American politics." (*Id.* at p. 239.)

Division Three of the Second District considered what constitutes a matter of public interest in its decision *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620] (*Church of Scientology*), disapproved on other grounds in *Equilon, supra,* 29 Cal.4th 53. The court explained that "[a]lthough matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." (*Church of Scientology*, at p. 650.) As examples of this point, the court cited product liability suits and real estate or investment scams. (*Ibid.*) The court concluded that the Church of Scientology was a matter of public interest because of the amount of media coverage the church received and the extent of its membership and assets. (*Id.* at p. 651.)

In *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] (*Seelig*), Division Five of this district considered the public-issue question. In that case, the plaintiff had participated as a contestant in the television program *Who Wants to Marry a Millionaire*. (*Id.* at p. 801.) "During her time on air, she stated only her name, that she was from San Francisco, and that she worked in sales at KFRC, a San Francisco radio station." (*Ibid.*, fn. omitted.) The plaintiff was contacted to appear on a radio program for a different station and declined. (*Id.* at p. 802.) A few weeks later, during the radio program, one of the broadcast co-hosts called the plaintiff a " 'chicken butt' " and a " 'local loser,' " and the radio on-air producer reported that the plaintiff's ex-husband had called her " 'a big skank.' " (*Id.* at pp. 802-805.)

The plaintiff sued the broadcast cohost, the on-air producer and others, alleging a variety of causes of action including slander per se and invasion of

privacy. (*Seelig, supra,* 97 Cal.App.4th at p. 806.) The defendants filed a special motion to strike, which the trial court denied. (*Ibid.*)

On appeal, Division Five of this district concluded that the defendants' comments were made in connection with an issue of public interest. (*Seelig, supra,* 97 Cal.App.4th at p. 807.) The court explained that the television show on which the plaintiff had appeared had "generated considerable debate within the media on what its advent signified about the condition of American society. One concern focused on the sort of person willing to meet and marry a complete stranger on national television in exchange for the notoriety and financial rewards associated with the Show and the presumed millionaire lifestyle to be furnished by the groom. By having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (*Id.* at pp. 807-808, fn. omitted.) The court further explained that the on-air discussion of plaintiff had focused on " 'why she wants to marry some random guy' " and why she did not come on the radio show to defend her participation in the televised contest. (*Id.* at p. 808.) The court concluded that "criticism of the refusal to defend her participation in the contest satisfies the requirement of being 'in connection with an issue of public interest.' (§ 425.16, subd. (e) (3).)" (*Seelig, supra,* 97 Cal.App.4th at p. 808.)

Other cases offer a more cursory consideration of the question of what constitutes a public issue or an issue of public interest. In *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8 [43 Cal.Rptr.2d 350] (*Ludwig*), the court summarily concluded that development of a mall, "with potential environmental effects such as increased traffic and impaction on natural drainage, was clearly a matter of public interest." (*Id.* at p. 15.) In *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400 [103 Cal.Rptr.2d 174] (*Dowling*), the court acknowledged that a letter written by the defendant came within the scope of section 425.16, subdivision (e)(2), but also concluded that it came within the scope of subdivision (e)(4) (*Dowling, supra,* 85 Cal.App.4th at p. 1420), the subdivision at issue in this case. The court explained that the letter "addressed conduct by [the plaintiff] that arguably involved public issues of nuisance and safety. It stated, for example, that someone had twice entered [a third party's] locked garage and turned the dial of their water heater off, which 'could be extremely dangerous, even fatal, to anyone in that building should the gas remain on, the flame be extinguished, and had the gas collected in the garage.' . . . The letter expressly stated that its purpose was to advise . . . of the potential nuisance and the safety concerns." (*Ibid.*)

In *M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623 [107 Cal.Rptr.2d 504] (*M.G.*), the plaintiffs' claims arose from a Sports Illustrated cover story

on incidents of child molestation in youth sports. (See *id.* at pp. 629-637.) The court's opinion focused on the plaintiffs' probability of success. (*Ibid.*) However, in a single paragraph, the court explained that the cover story was in furtherance of the publisher's right of petition or free speech in connection with a public issue. (*Id.* at p. 629.) The court initially observed that the "point [was] nearly conceded by plaintiffs." (*Ibid.*) The court then explained that "[a]lthough plaintiffs try to characterize the 'public issue' involved as being limited to the narrow question of the identity of the molestation victims, that definition is too restrictive. The broad topic of the article and the program was not whether a particular child was molested but rather the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest." (*Ibid.*)

None of these cases defines the precise boundaries of a public issue, but in each of these cases, the subject statements either concerned a person or entity in the public eye (see *Sipple, supra,* 71 Cal.App.4th at p. 239 ["nationally known figure"]; *Church of Scientology, supra,* 42 Cal.App.4th at p. 651 [extensive "media coverage"]; *Seelig, supra,* 97 Cal.App.4th at pp. 807-808 [discussion of participant in "a television show of significant interest to the public and the media"]), conduct that could directly affect a large number of people beyond the direct participants (*Damon, supra,* 85 Cal.App.4th 468; *Ludwig, supra,* 37 Cal.App.4th 8; *Dowling, supra,* 85 Cal.App.4th 1400; *Church of Scientology, supra,* 42 Cal.App.4th at pp. 650-651) or a topic of widespread, public interest (see *M.G., supra,* 89 Cal.App.4th at p. 629). Here, the Union's statements concerned the supervision of a staff of eight custodians by Rivero, an individual who had previously received no public attention or media coverage. Moreover, the only individuals directly involved in and affected by the situation were Rivero and the eight custodians. Rivero's supervision of those eight individuals is hardly a matter of public interest.

The Union disagrees, arguing that any time a person criticizes an unlawful workplace activity the statements concern a public issue because public policy favors such criticism. However, if the Union were correct, discussion of nearly every workplace dispute would qualify as a matter of public interest. We conclude, instead, that unlawful workplace activity below some threshold level of significance is not an issue of public interest, even though it implicates a public policy. The Union has not met its burden of establishing that its allegations concerning the situation at the International House exceed that threshold level.

Anticipating this conclusion, the Union also argues that the unlawful workplace activity in this instance is sufficiently significant because Rivero

worked at a *publicly financed* institution. Again, the Union's argument sweeps too broadly; under their argument, every allegedly inappropriate use of public funds, no matter how minor, would constitute a matter of public interest. However, the theft of a single pencil or the improvident purchase of a single piece of inexpensive computer hardware cannot amount to a public issue. Instead, more significant waste or abuse of funds will rise to the level of a public issue. For example, in *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036 [61 Cal.Rptr.2d 58], Division Four of this district noted that the financial well-being and integrity of a recognized branch of a large, publicly funded university medical school were legitimate matters of public concern. (*Id.* at p. 1047, fn. 5.)

Here, however, the Union has failed to establish that the actions of a supervisor of eight custodians rose to the level of a public issue. In fact, the Union's motion to strike does not offer any detail regarding the nature of Rivero's alleged acts of bribery, nepotism, theft and extortion, even though it is the moving party's burden to demonstrate that the complaint comes within the provisions of section 425.16. (*Equilon, supra,* 29 Cal.4th at p. 67.) We nevertheless glean from the record and oral argument that the allegations were that Rivero hired both his ex-wife's daughter and the wife of one of the full-time custodians; he supervised his ex-wife; he offered to nominate a custodian for a $2,500 service award if the custodian would share half of the award with him; he let a custodian sleep on the job; he borrowed or extorted $10,000 from another custodian and he gave a custodian permission to park his car in exchange for cigarettes. These allegations simply do not constitute matters of public interest.

The Union also attempts to portray the situation involving Rivero as affecting more than the eight individuals he supervised. The Union argues that the circumstances at International House relate to the Union membership's generalized concern regarding disrespectful supervision and of the broader issue of abusive supervision throughout the University of California system. The Union also claims that it included the information about the situation at the International House in the three documents because it wanted to provide an example of the steps custodians can take to stop misconduct. However, information that can be used as an example or as a motivator is not the same as information that has intrinsic value to others, such as information that a person's home might be in danger of exploding (see *Dowling, supra,* 85 Cal.App.4th at p. 1420), that a person may experience increased traffic due to construction of a mall (see *Ludwig, supra,* 37 Cal.App.4th at p. 15), or that management of a person's senior community may be ineffective (see *Damon, supra,* 85 Cal.App.4th at p. 472).

Moreover, the Union's use of the information in its publications should not turn otherwise private information into a matter of public interest. If publication were sufficient, anything the Union published would almost automatically become a matter of public interest. For example, if the Union reported in its newsletter that a supervisor arrived late for work last Wednesday, it could then argue that tardiness in supervisors was a matter of concern in the union membership. Alternatively, the Union could publish information in an effort to increase its membership vis-à-vis a competing union, as the Union did here, and thereby turn its purely private issue into a public one. If the mere publication of information in a union newsletter distributed to its numerous members were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, thus seriously undercutting the obvious goal of the Legislature that the public-issue requirement have a limiting effect.

The Union contends that this case is similar to *M.G.*, but we disagree. In *M.G.*, the publication occurred in a major magazine and the information, whose disclosure was the subject of the lawsuit, was used to address the "broad" and "general" topic of child molestation in youth sports. (*M.G., supra,* 89 Cal.App.4th at p. 629.) Here, in contrast, two of the documents focused exclusively on the situation at the International House. The other document included additional articles, but each article was presented as a separate story, not tied together to address a larger issue. This presentation indicates that the Union was simply reporting the situation at International House, a situation which standing on its own has no public interest.

The Union offers a third theory (arguably, from the record before us, the only theory offered the trial court) for finding that its conduct concerned a "public issue or an issue of public interest," namely, that the allegedly defamatory statements arose in the context of a major labor dispute. The Union relies on *Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees* (1999) 69 Cal.App.4th 1057 [82 Cal.Rptr.2d 10] (*Monterey Plaza*) and *Macias v. Hartwell* (1997) 55 Cal.App.4th 669 [64 Cal.Rptr.2d 222] (*Macias*). Neither case supports the conclusion that the Union's statements were made in furtherance of a "public issue or issue of public interest."

In *Monterey Plaza*, the Hotel Employees & Restaurant Employees Local 483 (HERE) filed unfair labor practice charges with the National Labor Relations Board (NLRB) against Monterey Plaza Hotel (the hotel). (*Monterey Plaza, supra,* 69 Cal.App.4th at p. 1060.) The NLRB's regional director found merit in HERE's contentions that "plaintiff threatened employees with termination for union activity, threatened to report prounion

employees to the Immigration and Naturalization Service, interrogated employees about union activity, created the impression of surveillance of union activities, and maintained an illegally restrictive policy against employee communications." (*Ibid.*) The NLRB's regional director dismissed HERE's charges that two housekeeping employees had been fired for supporting HERE, finding that the two women were supervisors who could be lawfully discharged for union activity. (*Ibid.*) HERE appealed the director's decision to dismiss those charges, and the general counsel's office of the NLRB sustained HERE's appeal and ordered the claims to be reinstated. (*Ibid.*)

Eventually, the hotel entered into a consent agreement that settled all items except the dispute as to the two discharged housekeeping employees. (*Monterey Plaza, supra,* 69 Cal.App.4th at p. 1062.) The administrative law judge who decided the remaining issue concluded that the two employees were indeed supervisors and therefore could be lawfully discharged for union activity. (*Ibid.*)

Meanwhile, however, a story about the labor dispute, including an interview with a union organizer, had been televised on a local news channel. (*Monterey Plaza, supra,* 69 Cal.App.4th at p. 1061.) The hotel sued HERE, among others, for defamation. (*Id.* at p. 1062.) The defendants filed a special motion to strike under section 425.16, which the trial court granted. (*Monterey Plaza,* at p. 1062.)

The hotel appealed the trial court's ruling. (*Monterey Plaza, supra,* 69 Cal.App.4th at p. 1067.) The appellate court affirmed, explaining that defendants met their burden of establishing that plaintiff's complaint arose from protected free speech activity because the challenged statements were "made during a major labor dispute in the community." (*Monterey Plaza, supra,* 69 Cal.App.4th at p. 1064.) The court then proceeded to consider whether the plaintiff had demonstrated a probability of prevailing on the merits and found that it had not. (*Id.* at pp. 1064-1066.) The court affirmed the trial court's decision to strike the complaint. (*Id.* at p. 1067.)

Unlike *Monterey Plaza,* the dispute between Rivero and the employees he supervised was an isolated incident and was not part of a larger union dispute. The Union disagrees, describing a larger union dispute that included negotiations for a new contract between it and the University of California, dealing with the university's decision to close the Mt. Zion hospital, representing employees in grievances and helping employees who were facing abusive supervisors. However, the Union's citations to the record do not

support these assertions. Moreover, the Union has described not a larger union dispute, but merely some of the ongoing functions of an active labor union.

The Union also relies on *Macias*, but that case is not applicable, either. In *Macias*, the plaintiff and the defendant had both run for the presidency of a union local. (*Macias, supra,* 55 Cal.App.4th at p. 671.) During that campaign, the defendant distributed a flyer that alleged that the plaintiff had been terminated from an earlier union position for " 'misappropriation of Union funds, insubordination and excessive absence, plus disloyalty.' " (*Ibid.*) A second flyer, which the defendant did not produce, publish, or distribute, was circulated alleging that the plaintiff was fired for theft. (*Ibid.*) The plaintiff lost the election and filed suit against the defendant for defamation. (*Id.* at p. 672.) The defendant moved to dismiss the complaint pursuant to section 425.16, and the trial court granted the motion. (*Macias,* at p. 672.)

On appeal, the plaintiff argued that section 425.16 "does not apply to campaign statements made in a union election." (*Macias, supra,* 55 Cal.App.4th at p. 672.) The appellate court disagreed. First, the court observed that other courts had found section 425.16 applied "to suits involving statements made during a political campaign [citation], statements made in connection with a recall election [citation], statements made in a political flyer concerning a candidate [citation], and statements made in a recall petition [citation]." (*Macias, supra,* 55 Cal.App.4th at p. 672.) Next, the court explained that "[u]nder the federal Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) every member of a labor organization has the right to express his or her view concerning candidates in an election of the labor organization." (*Id.* at p. 673.) The court further observed that statements against union officers are not actionable unless they were made with knowledge of their falsity or reckless disregard of their possible falsity. (*Ibid.*)

The court concluded, "Where, as here, a candidate speaks out on issues relevant to the office or the qualifications of an opponent, the speech activity is protected by the First Amendment. [Citation.] 'The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. "Public discussion about the qualifications of those who hold or wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment." [Citations.] . . . .' [¶] [The plaintiff's] contention that

the publication did not involve a public issue is without merit. The public issue was a union election affecting 10,000 members and her qualifications to serve as president." (*Macias, supra,* 55 Cal.App.4th at p. 673.)

*Macias* is clearly distinguishable. The campaign activity at issue in that case represented the quintessential subject of First Amendment protection. (*Macias, supra,* 55 Cal.App.4th at p. 673.) Here, in contrast, the supervision of eight low-ranking employees holds no similar special place.

The Union also argues that the subject of this complaint is a labor dispute within the meaning of section 527.3, subdivision (b)(4)(iii), and hence is a public issue. Neither *Monterey Plaza* nor *Macias* holds that all labor disputes arise from activity protected by the anti-SLAPP statute. Nor do we think such a conclusion would be proper. Section 527.3, subdivision (b)(4)(iii), defines a labor dispute as "includ[ing] any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee." Under this definition, nearly all aspects of union activity qualify as a labor dispute, but surely not every minor union activity rises to the level of a matter of public interest. Thus, even if the subject of this complaint concerned a labor dispute within the meaning of section 527.3, subdivision (b)(4)(iii), and even if that definition of labor dispute applies in this context,[5] those findings would not compel the conclusion that the situation between Rivero and his employees was a public issue.

In sum, we are faced with "disagreement about what issues truly possess 'public' significance," a question that the Supreme Court predicted would "inevitably . . . arise." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122 [81 Cal.Rptr.2d 471, 969 P.2d 564].) But, as that court also noted, some observers have said that a " 'public concern' " test, " ' "amounts to little more than a message to judges and attorneys that no standards are necessary because they will, or should, know a public concern when they see it." ' [Citations.]" (*Id.* at p. 1122, fn. 9.) To the extent those observers are correct, we note that we simply do not see a public concern in the allegations of Rivero's complaint.

Because we conclude that the Union did not meet its initial burden of establishing that the complaint arises from protected activity, we do not

---

[5]The definition of "labor dispute" provided in section 527.3, subdivision (b)(4), is "for purposes of [that] section" and that section defines certain conduct that the court may not enjoin. (See, e.g., § 527.3, subd. (b).)

consider whether Rivero met his burden of establishing a probability of success on the merits.

## IV.  DISPOSITION

We affirm.

Lambden, J., and Ruvolo, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 14, 2003. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.