Filed 1/30/20

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| MICHAEL JEPPSON, | B292166 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC684635) |
| v. | |
| ERIC LEY et al., | |
| Defendants and Appellants. | |


APPEAL from an order of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Affirmed.

Paul Law Firm, Bryon P. Josselyn, and Joshua S. Paul for Defendants and Appellants.

Law Offices of Barry G. Florence and Barry G. Florence; Law Offices of Kenneth W. Ralidis and Kenneth W. Ralidis for Plaintiff and Respondent.

————————————

This case requires us to define the "public interest" in the internet age. The issue arises in an anti-SLAPP motion: a special motion to strike claims under Code of Civil Procedure section 425.16. This statute can apply if the targeted claims arose from "protected activity," which the statute defines to include statements on an issue of "public interest."

Neighbors Eric Ley and Michael Jeppson are in a feud. Ley's dog killed Jeppson's cat. Aided by lawyers, Ley and Jeppson settled for $2,000 and a written agreement with a non-disparagement clause. But then Ley posted a hostile message on a neighborhood blog about Jeppson, who responded by suing Eric Ley and his wife for breach of contract, defamation, and intentional infliction of emotional distress. The Leys filed a special motion to strike Jeppson's complaint under Code of Civil Procedure section 425.16, which the court denied.

We affirm because Ley's new round in this neighborhood quarrel raised no issue of "public interest." Code references are to the Code of Civil Procedure.

I

Jeppson and the Leys are neighbors. They live a block and a half from each other. After the Leys' dog killed Jeppson's cat, the Leys paid Jeppson $2,000 as part of a mutual release and settlement agreement. Counsel advised the parties. The agreement contained a "Mutual Non-Disparagement" provision.

Bonnie Cates is another neighbor. After the Leys and Jeppson settled, a court granted Cates a civil harassment restraining order against Jeppson. Cates and her husband Jeffrey Otto alleged Jeppson hired men to cut through their fence, to trespass, and to trim their tree. Jeppson previously demanded Cates and Otto cut the tree because it interfered with

2

his ocean view; he had threatened action if he did not get his way. They said Jeppson had intimidated them by screaming at them at their house. Part of the restraining order commanded Jeppson to dispose of guns.

Cates told Heidi Ley about her troubles with Jeppson. Heidi Ley told Eric Ley, who "felt compelled" to warn the community to be aware of Jeppson.

On a neighborhood website called Nextdoor.com that allegedly reached some 951 neighbors, Eric Ley wrote a post titled "Michael Jeppson's Restraining Order." Ley wrote under the pseudonym "Ken Barrett," as follows:

"Since this is a neighborhood blog, I feel it is important to provide information about the case against Michael Jeppson for trespassing and vandalism on his neighbor's property. Michael Jeppson of Raymond James Financial Corporation and Jeppson Wealth Management could face jail time for these charges. Most importantly, a restraining order was issued on 6/27/2017, and the courts forced Michael Jeppson to relinquish his gun arsenal due to the danger he poses to his neighbors. If interested, you can review the court document at lacourts.org for a one dollar fee. The signs in Michael Jeppson's yard pictured below warn the neighborhood that he intends to solve disputes with gun violence, and he has stated this intent in countless blog posts and neighborhood fliers. Beware!"

Ley's post attached three photos of Jeppson's yard signs, which forbade trespassing with images of guns and a bullet-riddled human silhouette.

Jeppson sued the Leys for breach of contract, defamation, and intentional infliction of emotional distress. The Leys filed a

3

special motion to strike under section 425.16 in response to Jeppson's complaint, supported by declarations and other evidence. Jeppson opposed the Leys' motion. The Leys appeal the trial court's denial of their special motion to strike.

II

The law requires affirmance.

A

We independently review rulings on special motions to strike. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

B

Special motions to strike proceed in two steps. First the court determines whether Jeppson's claims arose from protected activity. The second step is a summary-judgment-like procedure to determine whether a plaintiff can establish a probability of success for each claim. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*).)

The first step, decisive of this appeal, is whether the Leys showed Jeppson's claims arose from "protected activity," which includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of *public interest* . . . ." (§ 425.16, subd. (e)(3), italics added.)

Determining the "public interest" invokes the public/private distinction, which is one of the most malleable in all the law. (See *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 ["we have struggled with the question of what makes something an issue of public interest"] (*Rand*); cf. Horwitz, *The History of the Public/Private Distinction* (1977) 130 U. Pa. L.Rev. 1423 [tracing history of distinction from the late medieval period]; see *id.* at p. 1426 ["By 1940, it was a sign of legal

4

sophistication to understand the arbitrariness of the division of law into public and private realms"].)

We are fully aware of the plasticity of the abstract notion of the "public interest." But our inquiry is not abstract. The Legislature wrote these two words, did not define them, and thus delegated the definitional job to the judiciary. Courts have been interpreting these statutory words for many years. The anchor of precedent moors us.

C

The six anchoring precedents are *Rand, Rivero, Weinberg, Workman, Abuemeira,* and *FilmOn.* (*Rand, supra,* 6 Cal.5th 610; *Rivero v. American Federation of State, County and Municipal Employees, AFL–CIO* (2003) 105 Cal.App.4th 913 (*Rivero*); *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 (*Weinberg*); *Workman v. Colichman* (2019) 33 Cal.App.5th 1039 (*Workman*); *Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291 (*Abuemeira*); *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*).)

We assay these six precedents to decide this case.

1

The *Rand* decision from the Supreme Court commands our first attention because it stated an authoritative general rule. *Rand* involved a business dispute between stadium developer Richard Rand and the City of Carson about a potential football franchise for the city. (*Rand, supra,* 6 Cal.5th at pp. 616–619.)

*Rand* is significant here, not because its facts are close to this case — they are not — but because it set forth a general definition of "public interest." It did so by stating three qualifying categories of statements or conduct, as follows.

5

1. The first category is when the statement or conduct concerns a person or entity *in the public eye*.
2. The second category is when the case involves conduct that could *directly* affect a large number of people beyond the direct participants.
3. The third category is when the case involves *a topic of widespread public interest*. (*Rand*, *supra*, 6 Cal.5th at p. 621.)

*Rand* quoted this three-part definition from the 2003 *Rivero* case, which is the case we analyze next. (*Rand, supra*, 6 Cal.5th at p. 621 [citing *Rivero, supra*, 105 Cal.App.4th at pp. 919–924].) The Supreme Court's citation and reliance endows *Rivero* with special authority, so to *Rivero* we turn.

2

The 2003 *Rivero* decision is the historic taproot of the guiding doctrine.

David Rivero had, for 18 years, supervised the eight janitors at International House on the campus of the University of California at Berkeley. Three of Rivero's subordinates accused him of wrongdoing. Even though an investigation could not substantiate their accusations, Rivero still lost his job as supervisor. Rivero sued the janitors' union, claiming it caused his termination by circulating disparaging documents about him. (*Rivero, supra*, 105 Cal.App.4th at p. 916.)

Rivero's claims included defamation and intentional infliction of emotional distress. Jeppson sues on these same grounds in this case. Also, as in this case the defense — there, the union — filed a special motion to strike. The trial court denied the union's special motion to strike, ruling the union's

statements about Rivero raised no issue of public interest. (*Rivero*, *supra*, 105 Cal.App.4th at p. 917.)

On appeal, the *Rivero* court affirmed.  The opinion surveyed case law about the "public interest" and found in each case the challenged statements concerned either:

1. a person or entity *in the public eye*,
2. conduct that could *directly* affect a large number of people beyond the direct participants, or
3. *a topic of widespread public interest.*  (*Rivero*, *supra*, 105 Cal.App.4th at p. 924.)

These are the same three categories the Supreme Court quoted in *Rand*.  (*Rand*, *supra*, 6 Cal.5th at p. 621.)

The phrasing of test three opened it to circularity, because defining the "*public interest*" as a "topic of widespread *public interest*" threatens to reduce the test to a tautology.  But the *Rivero* decision quelled this threat with further analysis that deflated two union efforts to abstract the case's narrow topic into a grander and more sweeping "public" issue.

We attend carefully to these two responses in *Rivero*, which were doctrinally prescient and which affect our decision of this case.

The union made two invalid arguments of this kind, seeking to enlarge its complaints about the supervisor of eight janitors into broad statements about the "public interest."

First, the union said statements concern a public issue *when people criticize unlawful workplace activities*, because public policy favors such criticism.  The *Rivero* court responded that, if that argument sufficed, then nearly *every* workplace dispute would qualify as a matter of public interest.  But "unlawful workplace activity below some threshold level of

7

significance is not an issue of public interest, even though it implicates a public policy." (*Rivero*, *supra*, 105 Cal.App.4th at p. 924.) *Rivero* thus rejected the union's first effort at abstraction.

Second, the union claimed the topic was of public interest because *Rivero worked at a publicly-financed institution.* The court also rejected this argument because it too "sweeps too broadly." Applying this argument generally, "every allegedly inappropriate use of public funds, no matter how minor, would constitute a matter of public interest. However, the theft of a single pencil . . . cannot amount to a public issue." (*Rivero*, *supra*, 105 Cal.App.4th at pp. 925–926.)

These two aspects of *Rivero* prefigured the Supreme Court's decision in *FilmOn* by 16 years. We return to the substance of *FilmOn* as the sixth case in our list. For now, we simply observe that, like *Rand*, *FilmOn* (and also the *Wilson* case) cited *Rivero* approvingly, thus reinforcing *Rivero*'s status as especially authoritative. (*FilmOn*, *supra*, 7 Cal.5th at pp. 149 & 150 [citing *Rivero*]; *Wilson*, *supra*, 7 Cal.5th at pp. 901 & 903 [also citing *Rivero* approvingly].)

In sum, the basic *Rivero* holding was that Rivero was a nonentity. The only people directly involved in and affected by the situation were Rivero and the eight custodians. Rivero's supervision of those eight people was "hardly a matter of public interest." (*Rivero*, *supra*, 105 Cal.App.4th at p. 924.)

3

Our third guiding precedent is *Weinberg*, which also is from 2003. *Weinberg* extensively cited and relied upon *Rivero*.

Plaintiff Weinberg and defendant Feisel were "aficionados of token collecting." Both belonged to the National Token Collectors' Association, which had about 700 members, and the

8

Western States Token Society, which had about 50 members. (*Weinberg, supra,* 110 Cal.App.4th at p. 1127.)

Feisel accused Weinberg of stealing one of Feisel's tokens at a token show. Feisel confronted Weinberg, got no satisfaction, and began a campaign to oust Weinberg from the token collecting avocation. Feisel published an ad in the national association's monthly newsletter, called Talkin' Tokens, that publicized aspects of the situation. Then he sent letters to over 20 collectors. Feisel also succeeded in barring Weinberg from the Western States Token Society Token Jamboree. Feisel continued to disparage Weinberg by writing to other collectors and by complaining to Weinberg's fellow retired police officer that Weinberg had a violent temper. (*Weinberg, supra,* 110 Cal.App.4th at pp. 1127–1129.)

Weinberg sued Feisel on some of the same claims as in this case: defamation and intentional infliction of emotional distress. Feisel filed a special motion to strike, which the trial court denied. The Court of Appeal affirmed.

The *Weinberg* decision surveyed a mass of decisions, including *Rivero,* to hold this controversy between token collectors was a private matter and not of public interest. The court stressed Feisel neither reported Weinberg to police nor sued him civilly. Rather, Feisel merely "began a private campaign" to discredit Weinberg "in the eyes of a relatively small group of fellow collectors." (*Weinberg, supra,* 110 Cal.App.4th at pp. 1126–1127 & 1135.) To qualify as a matter of public interest, the focus of the speaker's conduct had to be more than a mere effort "to gather ammunition for another round" in a private spat. (*Id.* at pp. 1132–1133.)

The *Weinberg* court demanded "some degree of closeness between the challenged statements and the asserted public interest . . . [T]he assertion of a broad and amorphous public interest is not sufficient . . . ." (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1132.) This aspect of *Weinberg* echoed *Rivero*'s rejection of public interest arguments that sweep too broadly, and likewise foreshadowed the Supreme Court decision in *FilmOn*.

As with *Rivero*, *Weinberg* has received Supreme Court approval. (*FilmOn*, *supra*, 7 Cal.5th at p. 149 [citing both *Weinberg* and *Rivero* approvingly].)

4

Our fourth guiding case is *Workman*, which involved facts analogous to the present dispute: a fracas between neighbors.

Plaintiff Donna Sue Workman put her home up for sale, found a buyer, and entered escrow. Defendant Colichman and another were residents of a neighboring property. These neighbors caused Workman's sale to fall through by telling her real estate agent they planned to build a house addition that would interfere with the sweeping views from Workman's house. Workman sued these neighbors for interfering with contractual relations and on other claims. The neighbors filed a special motion to strike, which the trial court denied because the case was "a private matter; not a public issue or an issue of public interest." The Court of Appeal affirmed. (*Workman*, *supra*, 33 Cal.App.5th at pp. 1042–1048.)

The *Workman* decision held that information about the views from a private residence is not an issue of public interest when the information affects only those directly interested in buying or selling the house. (*Workman*, *supra*, 33 Cal.App.5th at p. 1042.)

10

*Workman* relied on *Weinberg*.  (*Workman, supra*, 33 Cal.App.5th at pp. 1048–1050.)

The *Workman* court said *Weinberg* was like the *Workman* case in that both were instances of "limited communications to small groups of interested people."  (*Workman, supra*, 33 Cal.App.5th at p. 1052.)  "The views from a private residence do not involve a matter of public concern."  (*Id*. at p. 1053.)

*Workman* echoed a familiar theme by deflating defendant's efforts to magnify a neighborhood dispute into something of large social significance.  Defendants claimed the suit was about a public interest in attacking the "fraudulent practices of a real estate broker in marketing real property to the public."  The court's response was curt:  "This contention vastly overstates the issue in this case."  (*Workman, supra*, 33 Cal.App.5th at p. 1048.)

*Workman* basically held there was no public interest in squabbles between neighbors.

5

The fifth guiding precedent is *Abuemeira*, which was also about fighting neighbors.  This fight was violent, but in principle the case was the same as *Workman*.

Yasser Abuemeira drove his motorcycle inside his gated community.  Then there was some sort of road rage.  A man got out of his car and told Abuemeira he was a superlawyer.  What happened next was hotly disputed, but these two neighbors resorted to atrocious slurs and fisticuffs.  The superlawyer began to videotape the affray and then showed his video at homeowners association meetings and to police and reporters.  He created an online petition demanding the Attorney General investigate the incident.  When Abuemeira sued him, the superlawyer filed a special motion to strike.  The trial court denied this motion on the

11

ground that the superlawyer's efforts to publicize a dispute between private people did not transform the dispute into an issue of public interest. (*Abuemeira*, *supra*, 246 Cal.App.4th at pp. 1294–1298.)

*Abuemeira* affirmed. Citing *Weinberg*, the court ruled a "video recording of an unseemly private brawl, no matter how wide its distribution, is far removed from a citizen's constitutional right of petition or free speech involving a public issue." (*Abuemeira*, *supra*, 246 Cal.App.4th at pp. 1294 & 1298.) The fight involved "private, anonymous" parties and was nothing but a private dispute. (*Id*. at p. 1298.) Quoting *Weinberg*, the *Abuemeira* court wrote there is no public interest if the speaker's conduct is merely an effort "to gather ammunition for another round" in some private controversy. (*Ibid*.)

As in *Workman*, the holding in *Abuemeira* is that a neighborhood row is not a matter of public interest.

## 6

The sixth and final guiding precedent is *FilmOn*. This recent Supreme Court case was not factually close to our case: there were no feuding neighbors. Rather, an internet provider sued an internet authentication company. *FilmOn* nonetheless is significant for two reasons. The first is straightforward; the second is more complex.

First, *FilmOn* shows pre-internet rules do not change just because a case now involves the internet. This point is straightforward.

Second, the Supreme Court in *FilmOn* relied on *Rivero* and *Weinberg* to reject public interest arguments that sweep too broadly. We carefully study this second and more complex point.

12

*FilmOn* condemned public interest arguments "too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues," to merit protection.  (*FilmOn*, *supra*, 7 Cal.5th at p. 140.)  The court observed the recurring effort "to discern what the challenged speech is really 'about'—a narrow, largely private dispute, for example, or the asserted issue of public interest."  (*Id.* at p. 149.)  *FilmOn* reiterated *Weinberg's* requirement there be "some degree of closeness" between the challenged statements and the asserted public interest.  (*Id.* at p. 150.)  For that reason, that "a broad and amorphous public interest" can be connected to a specific dispute is not enough.  (*Ibid.*)  The proper focus of the inquiry instead must be on "the specific nature of the speech," not on "generalities that might be abstracted from it."  (*Id.* at p. 152.)

We follow that guidance in this case.

### D

These six precedents show there was no public interest in Ley's internet post about Jeppson.

Neither Ley nor Jeppson were in the public eye.

None of their acts directly affected a large number of people beyond the three households.  Ley claimed the mantle of town crier, but the conduct had *directly* involved only dog owner Ley, cat owner Jeppson, and tree owner Cates.

Despite the medium of the internet, the topic was not of widespread public interest.  There is no issue of public interest when the speaker's words are merely an effort to gather ammunition for another round in the speaker's neighborhood wrangle.

Ley and Jeppson had a history of personal conflict when Ley decided to upload to the internet about Jeppson.  Like the

13

union in *Rivero*, like the token collector in *Weinberg*, like the house seller in *Workman,* and like the superlawyer in *Abuemeira,* Ley sought to endow his statements with lofty justifications. But the matter boiled down to Ley's interest in gathering ammunition for another round in his clash with Jeppson. Ley's internet post merely manifested, and remained, his altercation with his neighbor.

Ley seeks to exalt his latest blast in the fray by making three points: the website claimed a potential audience of 951; Jeppson had been the target of an official court restraining order; and Ley's post invoked public safety.

As we have seen, cases over the years have deflated such attempts at abstraction, which are typical fare. The same principle holds here. The website had a *potential* audience of 951, but there is no evidence anyone *actually* read or cared about Ley's post. There was a restraining order on Jeppson that barred him from harassing his tree-owning neighbor Cates. Ley proclaimed Jeppson a threat to public safety, but this involved Jeppson trimming Cates's tree without her permission and Jeppson putting "no trespassing" signs in his yard. Jeppson owned guns, but the restraining order blocked Jeppson's access to them.

Ley's arguments are "too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues, to merit protection . . . " (*FilmOn, supra,* 7 Cal.5th at p. 140.)

Under the case law, this neighborhood flap did not raise issues about the "public interest," even though it made an appearance on the internet.

14

## E

We distinguish the decision in *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 397 (*Traditional Cat*). That case involved two competing and confusingly named associations, the "Traditional Cat Association" and "The Traditional Cat Association, Inc." The decision gave no information about the size of these associations. The decision called these associations "TCA" and "TTCA." We follow this usage.

A director and officer of TCA set up a website critical of TTCA and supportive of TCA. TTCA fought back by suing TCA and others about the website. TCA filed a special motion to strike, which the trial court denied. The *Traditional Cat* decision reversed this ruling. *Traditional Cat* held that, "[g]iven the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community, the Web site statements concerned matters of *public interest* in the cat breeding community." (*Traditional Cat*, *supra*, 118 Cal.App.4th at p. 397, italics added.)

The 2004 *Traditional Cat* decision cited none of the six precedents guiding us today. Four of those precedents were decided after 2004, so that learning was simply unavailable in 2004. In any event, *Traditional Cat* concerned two organizations and an online public of some indeterminate magnitude. It was not like this case.

Feuds can metastasize into the Hatfields and McCoys or the Montagues and Capulets. This tiff, though bitter, remained strictly local: a private affair and not a matter of "public interest."

15

**DISPOSITION**

The order is affirmed.  Costs to Jeppson.


WILEY, J.


We concur:


BIGELOW, P. J.


STRATTON, J.