Filed 7/30/15  Urological Medical Assocs. v. Yamauchi CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UROLOGICAL MEDICAL ASSOCIATES<br><br>    Plaintiff and Appellant,<br><br><br>    v.<br><br>GEORGE L. YAMAUCHI et al.,<br><br><br>     Appellants,<br><br><br>MARK W. TAMARIN et al.,<br><br>    Defendants and Respondents. | B251750<br><br>(Los Angeles County<br>Super. Ct. No. BC505912) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael M. Johnson, Judge.  Reversed and remanded with directions.

Law Offices of Steven Goldsobel, Steven M. Goldsobel and Becky Hsiao for Plaintiff and Appellant Urological Medical Associates.

Doll Amir & Eley, Michael M. Amir and Lloyd Vu for Appellants George Yamauchi et al.

Khouri Law Firm, Michael J. Khouri and Andrew B. Goodman for Defendants and Respondents Mark W. Tamarin et al.

# INTRODUCTION

Appellant Urological Medical Associates (UMA), a medical partnership, filed a complaint against one of its partners, respondent Dr. Mark Tamarin, alleging that Tamarin had engaged in Medicare fraud and seeking to remove him from the partnership. Tamarin filed a cross-complaint against UMA, his partners, appellants Drs. George Yamauchi, Nickolas Tomasic, and Sameer Malhotra (collectively, the Appellant Partners)—and two of UMA's attorneys, Steven Goldsobel and Jeremy Miller. Tamarin's cross-complaint denied that he committed Medicare fraud and alleged that the Appellant Partners had fabricated that claim (and related FBI investigation) to expel him from the partnership. The cross-defendants moved to strike the cross-complaint under Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1] The trial court denied the motions as to UMA and the Appellant Partners, concluding that Tamarin's claims arose out of an internal investigation and disciplinary action by a business entity; thus, UMA's conduct did not qualify for protection under the statute. However, the court granted Goldsobel's motion, reasoning that his conduct directly related to anticipated litigation. UMA and the Appellant Partners now appeal. We conclude the gravamen of the complaint arises from protected activity and therefore reverse and remand with directions to the trial court to determine whether Tamarin demonstrated a reasonable probability of prevailing on the merits of his claims.

# FACTUAL AND PROCEDURAL HISTORY

*A. UMA's Complaint and Tamarin's Cross-Complaint*

UMA filed a complaint against Tamarin on April 15, 2013 seeking a judicial determination for his expulsion from the partnership and further alleging claims for breach of contract, breach of fiduciary duty, and indemnification. According to the complaint, UMA was formed in 2001 pursuant to a Restated Partnership Agreement

---

[1] SLAPP is an acronym for Strategic Lawsuit Against Public Participation. All further statutory references are to the Code of Civil Procedure unless stated otherwise.

2

(RPA) by three urologists, Tamarin, Yamauchi, and Tomasic. UMA added Malhotra in 2008.[2]

The RPA provides that a partner may be expelled by unanimous vote of the Senior Partners (Tamarin, Yamauchi, and Tomasic) or by judicial determination if "(i) The Partner engaged in wrongful conduct that adversely and materially affected the partnership business; (ii) the Partner willfully or persistently committed a material breach of the Partnership Agreement or of a duty owed to the Partnership or the other Partners under Section 16404 of the California Corporations Code; or the Partner engaged in conduct relating to the Partnership business that makes it not reasonably practicable to carry on the business in partnership with the Partner." In the event of a partnership dispute, the RPA requires the parties to first meet and confer "to attempt to informally resolve such dispute," next to engage in "nonbinding mediation," and then, if those efforts are unsuccessful, "any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in litigation in any appropriate Court in Los Angeles County, California."

UMA alleged that Tamarin "engaged in wrongful conduct in connection with the practice of medicine, including performing medically unnecessary procedures, falsifying medical records and billing [Medicare] and other health care services payors for services that were medically unnecessary and/or did not warrant the amount billed." As a result, in late 2012, UMA barred Tamarin from handling any requests for urological consultation from a nearby hospital, refused to bill for Tamarin's recent consults to that hospital, began to review Tamarin's patient charts prior to any billing, and refunded "certain improperly billed amounts" to Medicare.

---

[2]     Each doctor has an associated corporation bearing his name (e.g., Mark Tamarin, M.D., Inc.); along with the individuals, these corporations were partners in UMA and parties in the lawsuits herein. We refer to each doctor and his corporation collectively by the doctor's last name. Similarly, attorneys Goldsobel and Miller, together with their respective law offices, are referred to by their last names.

On March 12, 2013, UMA requested that Tamarin "voluntarily withdraw from the partnership." According to UMA, Tamarin (through counsel) refused to withdraw and also refused to meet and confer or engage in mediation as required by the RPA. Tamarin's counsel also stated that he intended to assert "a multitude of claims against [UMA] and others." UMA therefore alleged that a judicial determination was necessary to expel Tamarin from the partnership based on his "wrongful conduct." UMA further alleged Tamarin's conduct put UMA and the Appellant Partners at risk of civil and criminal liability, required UMA to make repayments to Medicare, and caused UMA to incur "substantial expenses in connection with investigating and remedying" Tamarin's conduct.

Tamarin filed his cross-complaint on April 30, 2013, attaching a copy of the RPA. Tamarin alleged causes of action for fraud (against the Appellant Partners and attorneys Goldsobel and Miller), breach of contract, conversion of partnership assets, breach of fiduciary duty, and indemnification (all against the Appellant Partners), partnership dissolution (against the Appellant Partners and UMA), and legal malpractice (against Goldsobel and Miller). In essence, Tamarin's complaint alleges that appellants and their attorneys fabricated an investigation into his Medicare billing in order to "intimidate" him and force him out of the partnership.

Tamarin alleges the following events leading up to UMA's lawsuit. First, in late 2012, the Appellant Partners began holding "secret meetings" without him. In October 2012, Yamauchi and Malhotra attended a conference and received an offer for them and Tomasic (but not Tamarin) to join another urology group. The partners mentioned this proposal at a partnership meeting and suggested it "would be beneficial to break up the Partnership." In January 2013, the Appellant Partners requested that they have a meeting "about Medicare." All four partners, as well as Goldsobel and Miller, were present at the meeting, which was run by Goldsobel. Goldsobel "mentioned that the FBI was looking around the Partnership's office around November of 2012, and even approached the Partnership's office manager about wearing a wire." Tamarin alleged that Goldsobel was

4

in possession of all of Tamarin's records (without Tamarin's authorization) from a local hospital, and reviewed the billing entries during the meeting "to determine if anything needed to be paid back to Medicare." Tamarin claims he explained "a number" of the documents and his partners agreed with "his assessment." Goldsobel "emphasized that any money owed to Medicare would need to be paid back as soon as possible."

The same parties held a second meeting on March 12, 2013. Tamarin alleges that between the first and second meeting, the Appellant Partners, Goldsobel, and Miller reviewed Tamarin's bills "without consulting him, and in an attempt to build a case against him." During the second meeting, Tamarin "was accused of wrongful conduct involving his billing at an area hospital, and was asked to leave the Partnership within thirty days." Goldsobel and Miller then sent a check to Medicare in early April 2013, without Tamarin's consent.

Tamarin's first cause of action for fraud alleges that the statements made in the two meetings—that the FBI was investigating and that Tamarin had engaged in wrongful conduct—were false. Tamarin claims that the FBI was not investigating and did not approach anyone at UMA about wearing a wire, and further, that he did not engage in any billing misconduct, and that appellants made these statements to intimidate him and "eventually have him expelled from the Partnership, while holding him solely responsible for any Medicare payments, penalties, and fees associated with the Partnership's internal investigation." In addition, Tamarin has not received a salary since March 2013, "and continues to lose profits in his practice."

In his second cause of action for breach of written partnership agreement, Tamarin alleges that the Appellant Partners breached the RPA by holding "secret meetings" during which they made "numerous actions and decisions without [Tamarin's] approval, vote, or written consent." They also "converted the Partnership's assets to their own use," including by causing UMA to "incur attorneys' fees and coding consultant fees associated with an internal investigation" against Tamarin. This same alleged conduct forms the basis for Tamarin's causes of action for conversion of partnership assets,

5

breach of fiduciary duty, express contractual indemnification, and partnership dissolution, respectively.

Tamarin's final cause of action for legal malpractice alleges that while purportedly acting on behalf of UMA, Miller and Goldsobel "secretly conferred" with the Appellant Partners and each other "as they initiated and continued an internal investigation" against Tamarin, which "culminated in" UMA's lawsuit.

B. *The Anti-SLAPP Motions*

1. *Motions and Supporting Evidence*

UMA, the Appellant Partners, and Goldsobel all moved to strike Tamarin's complaint pursuant to section 425.16, arguing that the cross-complaint was retaliation for UMA's complaint and was based on statements made in connection with the investigations by UMA and the FBI.[3] The moving parties submitted declarations and other evidence in support of their motions.

Deanna Williams, UMA's practice manager, submitted a declaration stating that she was contacted by the FBI in late October 2012. She met with two Special Agents in early November 2012, who informed her "that the FBI was conducting an investigation regarding allegations of Medicare fraud" by Tamarin. Williams was "questioned [] for approximately an hour, primarily about Dr. Mark Tamarin and his billing practices." Shortly thereafter, the FBI asked if Williams "would be willing to cooperate with the investigation by wearing a wire." Williams then contacted Miller, "an attorney who regularly acted as counsel for UMA." Williams' declaration also attaches a copy of a grand jury subpoena received by UMA in May 2013. The subpoena, addressed to UMA's custodian of records, seeks Tamarin's practice records, including hospital billing records, appointment schedules, patient files and notes, and correspondence "concerning the preparation and submission of claims or supporting documentation to Medicare for or by" Tamarin.

---

[3]     Miller also moved to strike, but his motion papers are not in the record provided on appeal.

In his declaration, Malhotra stated that in November 2012, he learned two UMA employees had been interviewed by the FBI regarding Tamarin. UMA then contacted Miller, "who has been UMA's transactional legal counsel for a number of years." With Miller's assistance, UMA retained Goldsobel to "represent UMA in connection with what we understood to be a criminal investigation by the FBI regarding allegations of Medicare fraud by Dr. Tamarin."

Goldsobel submitted a declaration stating that he was retained in November 2012 by UMA "in connection with an investigation being conducted by the FBI into allegations of Medicare fraud" allegedly committed by Tamarin. He understood that he was being retained to represent UMA "in connection with the FBI's investigation to insure that UMA complied with its statutory obligations as a Medicare provider and to determine whether it had any rights and remedies against Tamarin in the event it was determined that he had committed Medicare fraud and/or other wrongful conduct." In connection with his investigation, Goldsobel spoke with an FBI agent and learned that the FBI had been investigating Tamarin prior to Goldsobel's retention. Goldsobel then conducted an investigation to determine whether any overpayments had to be reported and repaid to Medicare. Goldsobel confirmed his understanding that, if Tamarin had committed Medicare fraud and refused to withdraw from UMA and reimburse any losses, "litigation would be filed against him." Goldsobel stated that his investigation concluded that Tamarin had committed Medicare fraud and that repayments would exceed $100,000. The January and March meetings were held "[a]s part of the investigation."

*2. Tamarin's Opposition*

In opposition to the motions to strike, Tamarin argued that his cross-complaint was based on conduct unrelated to any official proceeding and that, in any event, no FBI investigation or Medicare fraud occurred. In support of his opposition, Tamarin filed a declaration in which he largely echoed the allegations made in his cross-complaint. Tamarin also averred that he had never met or heard of Goldsobel prior to the January 2013 meeting. Tamarin also included a declaration from Gary Morley, a former FBI

7

special agent. Morley, who retired in 2002 and thus was not involved in the FBI investigation at issue here, stated that he was not aware of any FBI agent "working on a healthcare fraud matter being authorized to confirm, with individuals or counsel not a party to the criminal investigation . . . [t]he existence of or results of an investigation."

Tamarin also submitted a letter sent by Miller to Tamarin's counsel on April 3, 2013, in which Miller requests that the parties meet and confer and submit to mediation pursuant to the RPA. Miller's letter also states that, "[t]o date, [UMA] has not formally taken any adverse action against Dr. Tamarin" beyond the request that Tamarin voluntarily withdraw, but that "there is ample evidence" Tamarin engaged in conduct that would allow UMA to expel him from the partnership pursuant to the RPA.

3. *Trial Court's Ruling*

On August 1, 2013, the trial court issued its ruling granting Goldsobel's motion to strike but denying the motions by UMA and the Appellant Partners.[4] After ruling on the parties' evidentiary objections, the court found that UMA and the Appellant Partners had not met their burden because "an internal investigation and disciplinary action by a business entity is not protected conduct. . . . This is true even if the underlying business or conduct is regulated by law." The court further rejected the argument that UMA's internal investigation qualified as an "official proceeding" under the anti-SLAPP statute.

With respect to Goldsobel, however, the court cited his contention that "he was acting only as an attorney representing UMA in its investigation of, and participation in possible litigation concerning, Tamarin's Medicare billing practices; unlike the others, his actions were not in connection with internal business affairs but were directly related to possible litigation." As such, Goldsobel met his burden to establish protected activity under the statute. Proceeding to the second step, the court found that Tamarin failed to

---

[4]     The court separately granted Miller's motion to strike. That ruling is not included in the record before us.

8

establish a probability of success on the merits of his claims against Goldsobel. UMA and the Appellant Partners timely appealed the denial of their motions to strike.[5]

## DISCUSSION

*A. Section 425.16 and Standard of Review*

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. '"While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right."' [Citations.]" (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson* ).)

"In 1992, out of concern over 'a disturbing increase' in these types of lawsuits, the Legislature enacted section 425.16, the anti-SLAPP statute. (§ 425.16, subd. (a).) The statute authorized the filing of a special motion to strike to expedite the early dismissal of these unmeritorious claims. (§ 425.16, subds.(b)(1), (f).) To encourage 'continued participation in matters of public significance' and to ensure 'that this participation should not be chilled through abuse of the judicial process,' the Legislature expressly provided that the anti-SLAPP statute 'shall be construed broadly.' (§ 425.16, subd. (a).)" (*Simpson, supra*, 49 Cal.4th at p. 21.)

Analysis of a motion to strike pursuant to section 425.16 involves a two-step process. (*Simpson, supra*, 49 Cal.4th at p. 21.) "First, the defendant must make a prima facie showing that the plaintiff's 'cause of action . . . aris[es] from' an act by the defendant 'in furtherance of the [defendant's] right of petition or free speech ... in connection with a public issue.' (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish 'a probability that the plaintiff will prevail on the claim.' [*Ibid*.]" (*Simpson, supra*, 49

---

5    An order denying a section 425.16 motion is immediately appealable. (§ 425.16, subd. (i);§ 904.1, subd. (a)(13).)

Cal.4th at p. 21, fn. omitted.) "Conversely, if the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step. [Citation.]" (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 265–266 (*Tuszynska*).)

We review an order denying an anti-SLAPP motion under a de novo standard. (*Tuszynska, supra,* 199 Cal.App.4th at p. 266.) In other words, we engage in the "same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step." (*Id.* at pp. 266-267, citation omitted.)

*B. Step One: Whether the Claims Arise From a Protected Activity*

   *1. Protected Activity*

In the first step of a motion to strike under section 425.16, the moving party has the burden of showing that the cause of action arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.) Thus, the moving party must establish both (1) that its act constituted protected activity; and (2) the cause of action arose from that protected activity.

The anti-SLAPP statute itself provides the parameters for protected activity. Section 425.16, subdivision (e) defines an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" as including: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; . . . (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

10

Appellants contend their conduct falls within the protections of the anti-SLAPP statute in four ways: (1) as an investigation in preparation for and anticipation of litigation under subdivision (e)(2); (2) as conduct in connection with an official FBI proceeding under subdivision (e)(2); (3) as an internal investigation in compliance with Medicare regulations and therefore qualified in its own right as an "official proceeding" under subdivision (e)(2); and (4) as conduct in connection with an issue of public interest under subdivision (e)(4). We agree that appellants' alleged conduct was protected as communications made in anticipation of litigation; we therefore need not reach their additional contentions.

Appellants point to their investigation, and related communications (including accusing Tamarin of committed Medicare fraud), as the qualifying conduct under the anti-SLAPP statute. Court have routinely held that "communications in connection with anticipated litigation are considered to be 'under consideration or review by a . . . judicial body'" under section 425.16, subdivision (e)(2). (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1263 (*Neville*); see also *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 (prelitigation letter covered as communication "preparatory to or in anticipation of the bringing of an action or other official proceeding"); *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600, 612 [protecting investigation and report prepared by employee at request of counsel]; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1285.) For example, in *Neville*, defendant employer sued its former employee for misappropriating customer lists and starting a competing business. (*Neville, supra*, 160 Cal.App.4th at p. 1259.) Four months before the litigation commenced, an attorney for the employer sent a letter to its customers accusing the employee of misconduct. (*Ibid.*) The employee sued the employer and the attorney for defamation. (*Ibid.*) The Court of Appeal affirmed the grant of the attorney's anti-SLAPP motion, holding that the statute protects statements made "in connection with" litigation where the statement "relates to the substantive issues in the litigation and is directed to

11

persons having some interest in the litigation." (*Id*. at p. 1266.) The court further rejected the plaintiff's argument that the four-month period between the issuance of the letter and the filing of the lawsuit meant there was no threat of impending litigation at the time the letter was sent. Noting that "'courts have adopted "a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16" [Citation.]' The court concluded that the statement was made 'in anticipation of litigation "contemplated in good faith and under serious consideration"' and was therefore protected.[6] (*Id*. at p. 1268.)

Here, the evidence and the allegations of the parties' complaints supports appellants' claim that they began their investigation into Tamarin's conduct in anticipation of, and preparation for, litigation. Tamarin, as a senior partner at UMA, could not be expelled by vote under the RPA. Thus, according to appellants, once they learned of the FBI investigation into Tamarin's billing, they began to take steps to investigate and confirm his misconduct, engage in the requisite attempts at dispute resolution, and then file the lawsuit seeking the judicial determination that would allow them to expel Tamarin from UMA. UMA retained Goldsobel for the express purpose of conducting the investigation and filing any necessary litigation, an understanding echoed by Goldsobel in his declaration. Indeed, Tamarin's own cross-complaint alleges that appellants "initiated and continued an internal investigation" and worked to "build a case against him," which "culminated in" UMA's lawsuit. Further, Tamarin's suggestion that the internal investigation could not have proceeded in good faith because there was no

---

[6]     We note that the cases cited by the trial court regarding an entity's internal investigation focus on whether the investigation *itself* may qualify under section 425.16 as an "official proceeding," not whether an investigation in anticipation of litigation is covered under the statute. (See *Donovan v. Dan Murphy Foundation* (2012) 204 Cal.App.4th 1500, 1508 [board of directors meeting not an official proceeding]; *Olaes v. Nationwide Mutual Ins. Co*. (2006) 135 Cal.App.4th 1501, 1508-1509 [corporate investigation not an official proceeding]; *Rivero v. American Federation of State, County and Municipal Employees* (2003) 105 Cal.App.4th 913 [considering application of subdivision (e)(4)].) These cases are therefore inapplicable to appellants' claim here.

12

evidence that the FBI was investigating is belied by the grand jury subpoena and by several witness statements regarding conversations with the FBI identifying Tamarin as the target of the investigation.

Tamarin also argues, in reliance on the trial court's order, that even if Goldsobel's and Miller's conduct could be protected as communications in anticipation of litigation, that protection does not extend to appellants. We disagree. Nothing in the language of the statute or the case law exempts conduct committed by non-attorneys from First Amendment protection, nor does Tamarin cite any authority for that proposition. Of course, attorney conduct is common in the "anticipation of litigation" context, but courts regularly apply the anti-SLAPP statute to protect non-attorney conduct as well. (See, e.g., *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043 [email sent by company president to clients regarding litigation with competitor]; *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1388 (*Coretronic*) [anti-SLAPP statute protects both litigants and "their attorneys' litigation-related statements"]; *Gallanis-Politis v. Medina*, *supra*, 152 Cal.App.4th at p. 612.)

As such, appellants have met their burden to establish that their statements made in connection with the investigation into Tamarin's Medicare billing qualify as protected conduct under section 425.16, subdivision (e)(2).

2.      *"Arising From"*

Appellants also must show that Tamarin's cross-complaint arises out of their protected activity. In considering whether a complaint arises from protected activity, "we disregard the labeling of the claim [citation] and instead "examine the principal thrust or gravamen of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies."" (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 267.) We assess the principal thrust by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." (*Martinez v. Metabolife Internat., Inc*. (2003) 113 Cal.App.4th 181, 189.) "'If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or

13

incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]' [Citation]." (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 267.) "[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

Appellants contend that the gravamen of Tamarin's claims is his allegation that their investigation was fraudulent and pretextual. Tamarin attempts to distance his cross-complaint from the investigation and subsequent litigation, arguing that his claims arose out of an internal business dispute and that any reference to the protected investigation was incidental. Specifically, Tamarin asserts that all of his causes of action "can be traced to three related acts": (1) "the false accusation of Medicare fraud"; (2) "the intentional failure to contact and consult with Dr. Tamarin about partnership decisions that affected him," including "the FBI interview, Goldsobel's retention, and the allegations of Medicare fraud"; and (3) Appellant Partners' "decision to incur over $108,000.00 in costs" without his consent.

Tamarin's own articulation of the basis of his cross-complaint is telling. Although he argues that his claims arise from a garden-variety partnership dispute, in fact Tamarin's identified categories confirm that each of his causes of action arises from the Medicare investigation. Appellants' accusations that Tamarin committed Medicare fraud were based on that investigation; Goldsobel was retained for the purpose of conducting the investigation and incurred investigation-related costs. Tamarin now attempts to recast his claims as centering on procedural partnership disputes, but the allegations in his cross-complaint identify the core injury-producing conduct—appellants and their counsel colluded to fraudulently claim he was the subject of an FBI investigation and to accuse him of Medicare fraud, with the goal of forcing him to leave the partnership while remaining responsible to pay the costs of the pretextual investigation. Because the investigation and related accusations are protected conduct under section 425.16, appellants have met their burden to show that Tamarin's claims arise from that conduct.

14

Tamarin cites to several cases decided by this District in support of his argument that, at most, appellants' investigation "triggered" his cross-complaint and/or provided the setting for his claims, but did not serve as their foundation. These cases are inapplicable to the facts here. In *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, the plaintiff sued an insurer, alleging it had engaged in claims handling misconduct over the course of several years under California's unfair competition statute. (*Id.* at p. 1391.) The complaint cited to evidence of that misconduct revealed in an investigation and report by the state Department of Insurance (DOI). (*Id.* at p. 1392.) Defendant moved to strike under section 425.16, arguing that its provision of information to the DOI was protected under the statute. The court disagreed, holding that although the DOI report might have "triggered" the plaintiff's action, "that action did not 'arise from' such report, nor from any communication by State Farm to the DOI in connection therewith." (*Id.* at p. 1399.) Instead, the plaintiff's claims were based on State Farm's alleged claims handling misconduct. (*Ibid.*) Similarly, in *Coretronic Corp. v. Cozen O'Connor*, *supra*, 192 Cal.App.4th at p. 1381, the alleged wrongful conduct was an attorney's simultaneous representation of two adverse parties and failure to disclose the potential conflict. (*Id.* at p. 1389.) That this conduct occurred within the context of litigation did not convert it into a SLAPP action. (*Ibid.*) Conversely, here, Tamarin's claims are directly premised on UMA's investigation, not merely on unrelated conduct that occurred against the backdrop of an investigation and subsequent lawsuit.

Finally, Tamarin's suggestion that we must accept his evidence as true and find that appellants' evidence does not "defeat Dr. Tamarin's as a matter of law" regarding the gravamen of his claims collapses the two steps in the anti-SLAPP analysis.[7] Our task in the first step is limited to determining whether the defendant made a prima facie showing that the plaintiff's claims arose from protected conduct. (See, e.g., *Chavez v. Mendoza*

---

[7] Tamarin also suggests that the trial court "must have" reached the same conclusion. Nothing in the trial court's order suggests that it weighed the parties' evidence as part of its step one inquiry. Even if it had done so, it would not affect our de novo review.

(2001) 94 Cal.App.4th 1083, 1087.)  The defendant "need not prove that the challenged conduct is protected by the First Amendment as a matter of law; only a prima facie showing is required.  (*Coretronic, supra*, 192 Cal.App.4th at p.1388.)  Appellants here have made that showing.

In sum, we conclude that appellants met their burden on the first step of their anti-SLAPP motions to strike.  Because the trial court reached the contrary conclusion, it did not address whether Tamarin met his burden to demonstrate a probability of prevailing on his claims against them.  We therefore remand the matter so that the trial court can decide this issue in the first instance.  (See, e.g., *Tuszynska*, *supra*, 199 Cal.App.4th at p. 267 [remanding for consideration of second prong].)

## DISPOSITION

The order denying UMA and the Appellant Partners' motions to strike pursuant to section 425.16 is reversed.  The matter is remanded to the trial court with directions to determine whether Tamarin met his burden under the second prong of the anti-SLAPP analysis.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, Acting P. J.


MANELLA, J.

16