Filed 10/23/20  Zilberstein v. Petersen CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AHRON ZILBERSTEIN,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL PETERSEN,<br><br>    Defendant and Appellant. | B301779<br>(Los Angeles County<br> Super. Ct. No. 18VECV00182) |

APPEAL from an order of the Superior Court of Los Angeles County, Huey P. Cotton, Judge.  Reversed in part and remanded with directions.

Michael Petersen, in pro. per., for Defendant and Appellant.

Law Offices of Stephen M. Feldman, Inc. and Stephen M. Feldman for Plaintiff and Respondent.

Defendant and appellant Michael Petersen created the website ahronzilberstein.com, using the name of plaintiff and respondent Ahron Zilberstein, where he published excerpts of legal pleadings that portrayed Zilberstein as a fraudulent businessman and slumlord. Zilberstein sued Petersen for false impersonation (Pen. Code, § 528.5) and bad faith registration or use of another's personal name in a website domain name (Bus. & Prof. Code, § 17525). Petersen filed a special motion to strike challenging the complaint as a strategic lawsuit against public participation (anti-SLAPP motion). (Code Civ. Proc., § 425.16.)[1] After finding Petersen's conduct to be protected activity under section 425.16, subdivision (e)(4), the trial court found Zilberstein had established a probability of prevailing on the merits of both causes of action. Thus, the court denied the motion.

Petersen appeals, contending that Zilberstein did not establish a probability of prevailing on either cause of action. Zilberstein contends Petersen did not engage in protected activity, as ahronzilberstein.com targeted a small but definable portion of the public and did not address matters of public concern. We conclude that Petersen's conduct constituted protected activity under the anti-SLAPP statute. We also conclude that Zilberstein established a probability of prevailing on the cause of action under the Business and Professions Code, but not on the cause of action under the Penal Code. We reverse the portion of the

---

[1]     Unspecified statutory references are to the Code of Civil Procedure.

order denying the motion to strike the first cause of action under Penal Code section 528.5.  In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Facts Leading Up to the Lawsuit*

This is the seventh lawsuit between Petersen and Zilberstein or his affiliates.  According to Petersen, throughout the course of the prior lawsuits, he discovered that Zilberstein had been using the judicial system to defraud individuals out of money and property.  To bring to light Zilberstein's fraudulent activity, Petersen created a website using Zilberstein's first and last names, "ahronzilberstein.com," to publish excerpts of pleadings (i.e. complaints, motions, and judgments) that had been filed against Zilberstein in other lawsuits.

B.    *The Complaint*

Following the website's publication, Zilberstein filed a complaint against Petersen alleging causes of action for (1) credible impersonation of another through the internet (Pen. Code, § 528.5); and (2) bad faith registration or use of a domain name that is identical or confusingly similar to the personal name of another person (Bus. & Prof. Code, § 17525).

Both causes of action were premised on Petersen's purchase, registration, and publication of ahronzilberstein.com without Zilberstein's knowledge or consent.  The complaint alleges that the website was designed to "smear" Zilberstein's name and destroy his goodwill and reputation, as the website was the first to appear

3

whenever someone searched Zilberstein's name on Google.  The complaint alleges that Zilberstein had lost prospective tenants, business partners and opportunities, and the ability to obtain loans of upwards of $4,800,000.  The complaint further alleges that the website led to his ouster from the board of directors of a Hebrew academy.  Attached to the complaint is 18 pages of website printouts, which is alleged to have used a color scheme (black, white, and red) that was used "for the most derogatory, injurious, non-factual statements" made against Zilberstein.

    1.    *The Website*

The top portion of the first page of the website printout provides links to "Home;" "Zilberstein Entities;" "Zilberstein Bankruptcies;" "Zilberstein Forgery Lawsuits;" "Zilberstein Slum Lord Lawsuits;" and "Zilberstein Lawsuits."  Beneath the links is the listed domain name ("AHRONZILBERSTEIN.COM"), followed by an introductory paragraph that states:  "Ahron Zilberstein owns and operates E & N Financial Services and Development, a company that allegedly 'assists' distressed real property owners [to] avoid foreclosure.  In the process of this mortgage 'assistance', Ahron Zilberstein has formed dozens of legal entities in which to transfer ownership interest in the distressed properties, where after [*sic*] bankruptcies are filed in order to frustrate creditors and lenders.  In implementing the foregoing strategy, Zilberstein uses four attorneys . . . .  These attorneys['] names will appear repeatedly in the lawsuits referenced herein.  Both Ahron Zilberstein and E & N Financial Services and Development have been the subject of dozens of lawsuits across southern California.  Below are

excerpts from a few of these lawsuits, along with links to the actual pleadings.  This website is by no means meant to be all inclusive of the multitude of litigation involving Ahron Zilberstein and his various entities.  The excerpts and lawsuits listed below, and on this website in general, are for purposes of research and education only, and are not meant as representing conclusive findings of the conduct as alleged therein."

The website printout then lists a lawsuit entitled "E & N Financial Services and Development v. Yury Volodinsky."  An excerpt from a motion for sanctions against attorneys for E & N Financial Services states:  "'For decades, Ahron Zilberstein has abused the judicial system in order to defraud an untold number of innocent victims.  He has lied under penalty of perjury and submitted false pleadings to the courts with impunity.  Up to this point Zilberstein has successfully evaded punishment by hiding behind sham entities and unscrupulous attorneys, who are willing to aid him in perpetrating his fraud in order to line their own pockets.'"

The next five pages of printouts display excerpts from pleadings filed in other lawsuits against Zilberstein or his affiliated entities and associates.  On the seventh page, the website lists excerpts from "an Objection To Bankruptcy Plan filed by [Haim Malka, an alleged associate of Zilberstein,] that gives a detailed analysis of how the 'bankruptcy mill' operates in relation to E & N Financial."  The excerpt states:  "'After being retained [by distressed property owners], Zilberstein would vest aforesaid distressed properties into several different partnerships and/or LLCs, and thereafter sequentially file . . .

5

sham bankruptcies, in order to delay foreclosures and force lenders and/or creditors into settlements. In most instances, the property owners would be stripped of their ownership of the properties by unknowingly signing sales agreements prepared by Zilberstein and his attorneys. None of the aforesaid bankruptcy filings are ever completed." In sum, the website printouts catalogue 28 different lawsuits between 2007 and 2015 that implicate Zilberstein and 12 different entities or associates in fraudulent loan assistance scams.

C.    *The Anti-SLAPP Proceedings*[2]

1.    *Petersen's Special Motion to Strike*

Petersen filed a motion to strike the complaint pursuant to section 425.16, arguing that both causes of action were based on conduct in furtherance of his right of free speech on a public issue. He also argued that Zilberstein could not establish probability of prevailing on the merits in either cause of action, as he did not impersonate Zilberstein or act in bad faith under Business and Professions Code section 17525.[3] In

---

[2]    Both parties filed objections to declarations supporting and opposing the motion to strike. Neither party has challenged the court's evidentiary rulings on appeal. We do not recite or use any factual statement that was excluded by the trial court.

[3]    As we will discuss, a person violates section 17525, subdivision (a) of the Business and Professions Code if he or she, with "bad faith intent[,] register[s], traffic[s] in, or use[s] a domain name that is identical or confusingly similar to the personal name of another . . . without regard to the goods or services of the parties." Section 17526 provides a non-exclusive list of factors to consider when determining "bad faith intent" pursuant to section 17525.

6

support, Petersen attached his own declaration and two email exchanges with Zilberstein.

### (a)   *Petersen's Declaration*

Petersen stated that he formed the website to (1) protect the general public, and (2) create a research aid for individuals and attorneys involved in litigation with Zilberstein.  Petersen provided his name and billing address on the invoice to GoDaddy for the formation of the website.

### (b)   *Email Exchanges*

On July 21, 2016, the same day Petersen paid GoDaddy to create the website, Petersen emailed Zilberstein and numerous attorneys.  His email stated:  "Dear attorneys,  [¶]  As promised some time back, I have finally published www.ahronzilberstein.com.  I apoligize [*sic*] for the rudimentary nature of the web site, it is only in it's [*sic*] beginning stages.  Over the next few days I will be creating pages for each separate lawsuit involving Ahron Zilberstein and his various alter egos, and will upload documents from those lawsuits to the specific page.  This should create a singular resource for cross-referencing representation being made in the various lawsuits.  [¶]  The web site is not dedicated to unprotected derogatory opinions, no matter how true.  The web site is dedicated to the publication of privileged public record documents, and my ultimate goal is for aforesaid web site to be a research aid for all those involved in litigation with Ahron Zilberstein, his alter egos and/or his 'agents'.  [¶]  With this in mind, if any of you

7

would like to scan and email me pleadings filed on your specific cases, it would be very much appreciated."

On July 29, 2016, Petersen sent another email to the attorneys and Zilberstein, stating that he had updated the website but was "still in the process of completing it." Zilberstein responded to the email, telling Petersen to "not include me in any of your future E-Mails. I find your conduct repugnant and demeaning and certainly unprofessional. I would rather not know of your nefarious activities." Petersen replied: "Well. . . . Then you're really gonna' dislike what I am going to do next lol."

### 2. *Zilberstein's Opposition*

Zilberstein filed an opposition to the motion to strike, and argued that Petersen's conduct was not protected activity, because it reached a "limited but definable portion of the public" (i.e. his associates, friends, adverse litigants, and attorneys) and did not concern a matter of public interest. Zilberstein also argued he would prevail on the merits of both claims.

As to the first cause of action (Pen. Code, § 528.5), Zilberstein argued that Petersen knowingly and without his consent impersonated Zilberstein by using his name to create the website's domain name. As to the second cause of action (Bus. & Prof. Code, § 17525), Zilberstein argued Petersen's reply email ("you're really gonna' dislike what I am going to do next lol") evidenced an intent to harm and threaten Zilberstein. Zilberstein attached supporting declarations from himself and from his attorney Stephen Feldman.

8

(a) *Zilberstein's Declaration*

Zilberstein stated that he believed Petersen had credibly impersonated him by using his name for the website. Zilberstein believed Petersen intended to harm and threaten him by publishing the website, which did not have a valid noncommercial use.

(b) *Feldman's Declaration*

Feldman stated that after creating the "misleading" website, Petersen contacted associates of Zilberstein and adverse litigants to direct them to the website.

3. *Petersen's Reply*

In his reply, Petersen argued the website served a legitimate noncommercial purpose by informing the public about Zilberstein's fraudulent business practices. He also asserted that the website's content disproved any notion that Zilberstein had created or endorsed the website.

4. *The Trial Court's Ruling*

Following a hearing, the court denied Petersen's motion to strike. Under *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn.com*), the court found Petersen's publication of ahronzilberstein.com to be protected activity under section 425.16, subdivision (e)(4), as conduct in furtherance of speech in connection with a matter of public interest—mortgage fraud.

9

Having met the first prong of the anti-SLAPP analysis, the burden shifted to Zilberstein to show a probability of success on the merits. The court found Zilberstein had met his burden under Penal Code section 528.5, because the "website [bears] only the Plaintiff's name, which would present evidence that Defendant knowingly impersonated Plaintiff." The court also found Petersen's email to Zilberstein ("you're really gonna' dislike what I am going to do next lol") suggested that Petersen intended to harm, intimidate, threaten, or defraud Zilberstein. The court found the same evidence established minimal merit to Zilberstein's claim under section 17525 of the Business and Professions Code. Under the non-exclusive list of factors in section 17526, the evidence sufficiently established "bad faith intent," as Petersen never received consent from Zilberstein to use the domain name (subd. (i)); the name of the website consisted entirely of Zilberstein's legal name (subd. (b)); and Petersen may have used the website for a non-legitimate use intended to impugn, disparage, and tarnish Zilberstein's name (subd. (d)).

Petersen filed a timely notice of appeal.

## DISCUSSION

SLAPP suits—strategic lawsuits against public participation—are "generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 816, disapproved on another ground in *Equilon v. Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53 (*Equilon*).) To

10

combat these types of suits, the Legislature enacted section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits or individual causes of action that are brought to chill the valid exercise of a person's constitutional rights. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056; see *Baral v. Schnitt* (2016) 1 Cal.5th 376, 395; § 425.16, subd. (b)(1).)

The anti-SLAPP statute requires a two-step process: first, the moving party must establish that the lawsuit's claims are based on activity protected by the statute. (*Briganti v. Chow* (2019) 42 Cal.App.5th 504, 508 (*Briganti*).) If the defendant meets that burden, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. (*Ibid.*) "'[W]ithout resolving evidentiary conflicts,'" the court must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment; if not, the claim is stricken. (*Ibid.*) "In making these determinations the court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).)" (*Ibid.*)

We review the trial court's decision to grant or deny an anti-SLAPP motion de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

A.   *Step One:  Protected Activity*

Zilberstein contends Petersen's conduct (i.e. registering and publishing the website) is not protected as conduct in furtherance of speech on a matter of public interest or a public issue (§ 425.16, subd. (e)(4).  Subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)  Though Zilberstein agrees that Petersen has engaged in conduct in furtherance of the exercise of his right of free speech (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166), Zilberstein questions whether such conduct was in furtherance of speech "in connection with a public issue or an issue of public interest."

We conclude that Petersen's conduct constitutes protected activity in connection with a public issue or an issue of public interest, as those terms are understood under section 425.16, subdivision (e)(4).  The Supreme Court's decision in *FilmOn.com* guides our analysis.  In that case, the Court provided a two-step approach to determine whether speech concerns a matter of public issue or public interest.  First, courts must determine what public issue or issue of public interest the speech implicates.  (*FilmOn.com, supra*, 7 Cal.5th at p. 149.)  To assist courts in ascertaining whether speech implicates a public issue or an issue of public interest, the Court in *FilmOn.com* incorporated the approach taken in *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*), and

12

*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*). (*FilmOn.com, supra*, at p. 149.) The *Rivero* decision identifies three elements that may be present in statements concerning matters of public interest. Those elements include (1) persons or entities "in the public eye"; (2) conduct that "could directly affect a large number of people beyond the direct participants"; or (3) "topic[s] of widespread, public interest." (*Rivero, supra,* 105 Cal.App.4th at p. 924; accord, *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 881 [communications must concern an "issue of public significance"].) Those statements may not "equate with mere curiosity," but should concern a topic relevant to a substantial number of people. (*Weinberg, supra*, 110 Cal.App.4th at p. 1132.)

Under the second step, courts must "ask what functional relationship exists between the speech and the public conversation about" the matter public interest. (*FilmOn.com, supra*, 7 Cal.5th at pp. 149–150.) This requires consideration of context, including the identity of the speaker, the audience sought, the timing and location of the speech, and the apparent purpose of the conduct to determine whether there is "'some degree of closeness'" between the speech and the topic of asserted public interest. (*Id.* at pp. 142–144, 150; see *id.* at p. 152 ["the focus of our inquiry must be on 'the specific nature of the speech,' rather than on any 'generalities that might be abstracted from it'"].) To be protected activity, the speech itself must contribute to the public debate "'in some manner.'" (*Id.* at p. 150.)

In *FilmOn,* the defendant distributed confidential reports that characterized some of the plaintiff's websites as depicting "adult content" or copyright infringing material.[4] (*FilmOn.com, supra,* 7 Cal.5th at pp. 140–142, 152–153.) Under the first step, the Court found that the reports concerned issues of public interest because the public has a demonstrable interest in knowing what content is available on the internet, particularly adult content and the illegal distribution of copyrighted material. (*Id.* at p. 142.) Under the second step, however, the Court found the reports did not further public conversation on either issue—the reports addressed a private dispute over another's business practices in a confidential report that was never distributed to the public. (*Id.* at pp. 153–154.)

In this case, Petersen's website implicated an issue of public interest or public issue. The content of the website clearly implicates the issue of mortgage fraud committed against at-risk property owners, as the excerpts of pleadings taken from past (2007) and potentially ongoing (2015) lawsuits describe Zilberstein's alleged fraud in divesting properties from distressed owners under the guise of mortgage assistance. Members of the public, particularly those already victimized by the 2008 mortgage crisis (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 923), have an interest in being

---

[4] The reports defined "adult content" as "[m]ature topics which are inappropriate viewing for children including explicit language, content, sounds and themes." (*FilmOn.com, supra,* 7 Cal.5th at p. 141, internal quotation marks omitted.)

informed of issues concerning predatory mortgage assistance. (*Rivero*, *supra*, 105 Cal.App.4th at p. 924; accord, *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 947 [physician's allegedly deficient ethics and qualification constituted public issue]; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 661 [defendant's demonstrations and flyer concerning plaintiff's wrongful evictions and retention of security deposits of more than 100 tenants constituted public issue]; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650 ["matters of public interest include . . . product liability suits, real estate or investment scams, etc."], disapproved on another ground in *Equilon*, *supra*, 29 Cal.4th 53.)

Moreover, Petersen's website was not limited to his own disputes with Zilberstein. The website printouts do not list Petersen's lawsuits, and do not single out Zilberstein as the only responsible party in the fraudulent mortgage assistance scams. The website depicts a complex web of entities and individuals involved in the fraud, including 12 affiliated entities and individuals associated with Zilberstein. These circumstances also suggest the website informed the public about mortgage fraud in the community. (See *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366 ["consumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest"]; *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 483 [defendants "did not limit their discussion to the

15

Church," but "raised the issue of child molestation and abuse in other churches in the . . . organization"].)

The website also contributes to the public debate "'in some manner.'" (*FilmOn.com*, *supra*, 7 Cal.5th at p. 150.) The audience Petersen sought, and the timing and location of the speech, all show a degree of closeness between the website's publication and the ongoing public understanding of predatory mortgage scams. The website could be readily accessed by an internet search of Zilberstein's name. Once there, any member of the public—whether a lawyer involved in ongoing litigation, a distressed property owner interested in Zilberstein's assistance, or Zilberstein's associates—could learn about the alleged scams. Thus, the "union of content and context" (*id.* at p. 154) establishes a sufficient degree of closeness between the website's publication and the message to the public to merit application of the catchall provision in section 425.16, subdivision (e)(4).

Even if were we to conclude otherwise—that the website did not touch on matters of interest to the public at large—Petersen's conduct would still be protected as activity encouraging participation in an "ongoing controversy, dispute or discussion." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119; see *ibid.* [the anti-SLAPP statute protects such conduct because it "embodies the public policy of encouraging *participation* in matters of public significance"].) Petersen's emails establish that the website was not an end in itself, but was intended in part as creating a research aid for ongoing lawsuits with respect to Zilberstein's past and continued conduct.

16

Anticipating our conclusion with respect to section 425.16, subdivision (e)(4), Zilberstein contends that Petersen's conduct cannot be protected under the anti-SLAPP statute because it was illegal as a matter of law under Penal Code section 528.5. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 317 ["section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition"]; see *Simmons v. Bauer Media Group USA, LLC* (2020) 50 Cal.App.5th 1037, 1046, fn. 7 ["illegal as a matter of law" intended to mean criminal, nor merely violative of a statute].) As we discuss below, we disagree.

B. *Probability of Prevailing on the Merits*

In light of our conclusion that Petersen's conduct constitutes protected activity, the burden shifts to Zilberstein to demonstrate a probability of prevailing on each claim arising from that conduct. In other words, Zilberstein must "'demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citation.] Under the "'summary-judgment-like procedure'" applicable at this step, the court 'does not weigh evidence or resolve conflicting factual claims.' [Citation.]" (*Briganti, supra,* 42 Cal.App.5th at p. 509.)

17

## 1.    *False Impersonation*

To prevail on his first cause of action for false impersonation, Zilberstein was required to present a prima facie showing of facts that Petersen "knowingly and without consent credibly impersonate[d Zilberstein] through or on an Internet Web site or by other electronic means for purposes of harming, intimidating, threatening, or defrauding another person."  (Pen. Code, § 528.5, subd. (a).)  "For purposes of this section, an impersonation is credible if another person would reasonably believe, or did reasonably believe, that the defendant was or is the person who was impersonated."  (*Id.*, § 528.5, subd. (b); see *People v. Barba* (2012) 211 Cal.App.4th 214, 222, fn. 6 ["impersonate" refers to "the act of portraying oneself to be someone else"].)

Zilberstein has not made a sufficient factual showing that Petersen "credibly impersonated" him through the website.  The only admissible evidence on which Zilberstein relies is the website's domain name.  But the website's content unequivocally establishes that Zilberstein would never have created or endorsed the site.  The website provides links to "Zilberstein Bankruptcies," "Zilberstein Forgery Lawsuits," and "Zilberstein Slum Lord Lawsuits," and specifically illustrates Zilberstein's participation in fraudulent mortgage assistance scams and bankruptcies.  Moreover, the website never references Zilberstein or his affiliates in the first person.  Thus, by the words, tone, and color (the website's use of black, white, and red highlighted Zilberstein's fraudulent conduct), no person would reasonably believe that Zilberstein had created or was responsible for the website.

18

The only other evidence Zilberstein purports to rely on is a statement in his declaration that he believed Petersen credibly impersonated him on the website. His subjective belief is insufficient as a matter of law to create a triable issue of credible impersonation. (See *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 ["plaintiff's subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations"].) Thus, because Zilberstein has not set forth a sufficient prima facie showing on the first cause of action, we reverse the portion of the order denying the motion to strike. On remand, the court is instructed to grant Petersen's motion and strike this cause of action.

2. *Bad Faith Registration or Use of Another's Name as a Domain Name*

To prevail on his second cause of action, Zilberstein was required to present a prima facie showing that Petersen, "with bad faith," intended "to register, traffic in, or use a domain name, that is identical or confusingly similar to [Zilberstein's name] without regard to the goods or services of the parties." (Bus. & Prof. Code, § 17525, subd. (a).)

Section 17525 of the Business and Professions Code is part of the state's Cyber Piracy Act (Stats. 2000, ch. 218, § 1), which expanded on the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d), hereafter "ACPA").[5] The Cyber Piracy Act utilized the ACPA's "non-

---

[5]     The enacting legislation for Business and Professions Code section 17525 defines "cybersquatting" as the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names

19

exclusive list of factors" that courts are to consider when determining if a defendant engages in "bad faith." (Sen. Rules Com., Analysis of Sen. Bill No. 1319 (1999-2000 Reg. Sess.) as amended June 26, 2000, p. 7.) That list of factors appears in section 17526 of the Business and Professions Code.

Here, the parties agree that only 4 of the 10 non-exclusive factors (subdivisions (b), (d), (g), (i)) are at issue.[6] Those subdivisions look to "[t]he extent to which the domain name consists of the legal name of the person alleged to be in violation of this article" (subd. (b)); "[t]he legitimate noncommercial or fair use of the person's . . . name" in the website (subd. (d)); "[t]he intentional provision by the person alleged to be in violation of this article of material and misleading false contact

---

back to the trademark owners. (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1319 (1990-2000 Reg. Sess.) June 20, 2000, p. 4.)

Senate Bill No. 1319 was "intended to address flaws in federal law, including the requirement that there be a showing of intent to profit from the trademark or name. While the bill does allow a court . . . to consider whether the person alleged to be in violation intended to profit from registering the name . . . , there is no requirement in the bill that there be a showing of intent to profit." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1319 (1990-2000 Reg. Sess.) June 20, 2000, p. 5.)

[6] The six remaining factors concern holding of trademarks or other intellectual property rights by the person alleged to be violation of section 17525 (subd. (a)); using the domain name in connection with the bona fide offering of goods or services (subd. (c)); intending to divert consumers from the online location that could harm the person's goodwill (subd. (e)); offering to transfer, sell, or assign the domain name to the rightful owner or any third party for substantial consideration (subd. (f)); acquiring multiple domain names that are identical or confusingly similar to names of other persons (subd. (h)); and intending to mislead, deceive, or defraud voters (subd. (j)).

information when applying for the registration of the domain name" (subd. (g)); and "[w]hether the person alleged to be in violation of this article sought or obtained consent from the rightful owner to register, traffic in, or use the domain name" (subd. (i)).

These factors are not determinative on the issue of bad faith, as we consider the overall factual context to "'make a determination based on those facts whether or not the defendant . . . used the domain name with bad-faith intent.'" (Sen. Rules Com., Analysis of Sen. Bill No. 1319 (1999-2000 Reg. Sess.) as amended June 26, 2000, p. 8, quoting Sen.Rep. No. 106-140, 1st Sess., p. 10 (1999); see *id.* at p. 9 ["the presence or absence of any of these factors may not be determinative"]; *Sporty's Farm L.L.C. v. Sportman's Market, Inc.* (2d Cir. 2000) 202 F.3d 489, 498 ["we are not limited to considering just the listed factors [under the ACPA] when making our determination of whether the statutory criterion has been met"].)

Mindful that some evidence reflects good faith intent (Petersen furnished his contact information when registering the website (subd. (g)) and provided evidence of a genuine, noncommercial use for research and consumer reporting (subd. (d)), we conclude that Zilberstein has established prima facie showing of bad faith intent. Petersen's name does not appear in the domain name of the website (subd. (b)), and he did not obtain consent prior to registering or using Zilberstein's name (subd. (i)). Evidence of a genuine, noncommercial purpose notwithstanding, Petersen's reply email to Zilberstein ("you're really gonna' dislike what I am going to do next lol") suggests he also intended to disparage or harm Zilberstein's reputation. In sum, these facts

21

substantiate a legally sufficient claim under Business and Professions Code section 17525. (*Briganti, supra*, 42 Cal.App.5th at p. 508.)[7]

## DISPOSITION

The portion of the court's order denying Petersen's motion to strike the first cause of action is reversed. On remand, the court is directed to grant the motion and strike the first cause of action. In all other respects, the order is affirmed. Each party shall bear its own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

CURREY, J.

---

[7] We do not address Petersen's alternative contentions, raised for the first time on appeal, that section 528.5 of the Penal Code and sections 17525 and 17526 of the Business and Professions Code are preempted by the ACPA, or are unconstitutionally vague and overbroad. (*Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 92; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)