Filed 6/12/26  Watson v. Noda CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH C. WATSON, | D087163 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVDS2019209) |
| RAYMOND NODA et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Bernardino County, Donald R. Alvarez, Judge.  Reversed and remanded with instructions.

Kassouni Law and Timothy V. Kassouni for Plaintiff and Appellant.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, Tara N. Swanson, and John P. Cogger for Defendant and Respondent Raymond Noda.

Kulik Gottesman Siegel & Ware and Gerard R. Kilroy for Defendant and Respondent Nicole Natalie Sams as Trustee of the Pickett Family Trust.

I. INTRODUCTION

Joseph C. Watson appeals from the trial court's order granting anti-SLAPP motions filed by Raymond Noda, and by Nicole Natalie Sams as Trustee of the Pickett Family Trust (Sams).  We find the trial court should

have denied Sams's motion as untimely because 60-day statutory timeline to file the motion expired years earlier against her predecessor in this action, and Sams's substitution as a successor in interest did not revive that deadline or give the trial court discretion to hear the untimely motion.

We further find that the trial court should have denied Noda's motion because the conduct underlying the challenged causes of action concerned a 13-member homeowners association (HOA) and therefore, in this case, did not involve a "public issue" or "issue of public interest." We reverse and remand with instructions.

## II. BACKGROUND

### A. *Litigation Between the Parties*

Montara Estates, Inc., (Montara) is an HOA that governs a 36-lot, common interest development in San Bernardino County. Lot owners have a membership interest in Montara, and each lot is entitled to one vote in association matters. During the relevant time, there were 13 owners of the lots within Montara.[1] Watson owned 15 lots, Nathaniel Pickett owned six lots, and Noda owned three lots.

Between approximately 2007 and 2018, Watson served on Montara's board of directors and was Montara's attorney. In 2016, Watson filed a lawsuit on behalf of Montara alleging that Pickett failed to pay association assessments (case No. CIVDS1611475). This started a 10-year period during which several HOA members filed lawsuits and counter-lawsuits against each other. In 2018, Pickett sued Montara, Watson, and another association

---

[1] During oral argument, there was disagreement about the number of lot owners. However, an uncontradicted declaration from Watson reflects there were 13 owners. Noda also acknowledged in his reply brief that Montara was "comprised of 13 different lot owners."

member named Patty Biggerstaff for breach of contract, breach of fiduciary duty, and conversion (case No. CIVDS1818100). Pickett alleged that the association paid various amounts to Watson and Biggerstaff without following the proper procedures to approve those payments. Pickett also alleged that Montara did not properly authorize the lawsuit against Pickett or the collection and increase of association assessments. Watson responded with a cross-complaint against Pickett, Noda, and Diego Seglin, another association member.

Two years later, on September 14, 2020, Watson initiated the current case (case No. CIVDS2019209). In his first amended complaint (FAC) filed on September 22, 2020, Watson named Noda, Pickett, and Seglin as defendants. The FAC contains four causes of action: (1) violations of the Davis Sterling Act, (2) defamation, (3) breach of fiduciary duty, and (4) intentional infliction of emotional distress (IIED).

In the first and third causes of action, Watson challenged various actions that Noda, Pickett, and Seglin took as Montara board members following their election in 2018. As for his defamation and IIED claims, Watson alleged that the defendants made "numerous false statements both orally and in writing to the effect that . . . Watson was 'going to jail,' 'going to jail for stealing money from [Montara],' 'stealing money from [Montara],' 'was misusing [Montara] funds,' and 'was making vital decisions regarding [Montara] without consulting other members of the HOA.' " These statements were allegedly made to "other owners and tenants in the [Montara] complex," in an attempt "to bully, harass, and intimidate [Watson] and [Montara] members in to not pursing collections against Defendants."

On August 4, 2021, Montara sued Watson in yet another case (case No. CIVSB2122422), alleging several causes of action stemming from

3

Watson's service on Montara's board. On October 12, 2021, Watson cross-complained. In his first amended cross-complaint (FACC) filed weeks later, Watson asserted various causes of action, including defamation and IIED against Noda and Sams based on substantially similar allegations as the FAC. The trial court consolidated case numbers CIVSB2122422 and CIVDS2019209.

In 2022, the two earlier cases (case Nos. CIVDS1611475 and CIVDS1818100) were dismissed in connection with a settlement. Later that year, Pickett filed a motion for judgment on the pleadings in the current case asserting that the first and third causes of action in FAC were barred because those matters had been adjudicated in case numbers CIVDS1611475 and CIVDS1818100. The trial court granted the motion as the first cause of action with leave to amend and denied it as to third cause of action.

On March 8, 2023, Watson filed a second amended complaint (SAC). The defamation and IIED allegations remained the same, while Watson revised the dates for the alleged violations of the Davis Sterling Act and breach of fiduciary duties.

Pickett died on February 28, 2023. On September 12, 2023, the trial court granted Watson's motion to substitute Sams as Pickett's successor in interest.

## B. Anti-SLAPP Motions

On March 14, 2023, Noda filed an anti-SLAPP motion seeking to strike the defamation and IIED causes of action in the FACC. Sams then filed her anti-SLAPP motion on October 17, 2023, seeking to strike the defamation and IIED causes of action in the SAC.

Watson opposed the motions, arguing they were untimely and lacked merit. In his supporting declarations, Watson stated that Pickett began

4

making his allegedly defamatory statements around 2015 and 2016 when Watson pursued Pickett for unpaid association assessments. Watson declared that Noda's allegedly defamatory statements started in 2018 when Watson insisted that Noda pay a special assessment that Noda voted against. Watson also filed declarations from one association member and one tenant stating they heard the challenged statements, and one declaration from a friend describing Watson's reaction to the statements.

The trial court granted both motions, finding that "the defamation and IIED causes of action arose from protected speech and Watson fail[ed] to meet his burden of demonstrating a probability of prevailing as the litigation privilege applies." Watson timely appealed.

## III. DISCUSSION

Watson argues the trial court should have denied both anti-SLAPP motions as untimely. He further contends the trial court erred in both prongs of the two-pronged anti-SLAPP analysis. We find Sams's motion untimely. Noda's motion was timely, but the trial court erred in finding that the anti-SLAPP statute protected Noda's conduct underlying the defamation and IIED causes of action. We therefore reverse.

### A.    *The Anti-SLAPP Statute and Standard of Review*

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that

5

the plaintiff will prevail on the claim." (Code Civ. Proc.,[2] § 425.16, subd. (b)(1).) The protected acts under the statute include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3) & (4).)

A trial court reviews an anti-SLAPP motion "using a two-prong test: (1) has the moving party 'made a threshold showing that the challenged cause of action arises from protected activity' [citation]; and, if it has, (2) has the nonmoving party demonstrated that the challenged cause of action has ' "minimal merit" ' by making 'a prima facie factual showing sufficient to sustain' a judgment in its favor?" (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021–1022.)

"We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. [Citations.] 'In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted.' " (*Geragos v. Abelyan, supra,* 88 Cal.App.5th at p. 1020.) "We consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Ibid*.)

---

[2]     All further undesignated statutory references are to the Code of Civil Procedure.

*B.     Noda's Motion Was Timely, Sams's Was Not*

An anti-SLAPP "motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." (§ 425.16, subd. (f).)  The time to file the motion runs from service of the earliest complaint containing the cause or causes of action sought to be stricken.  (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 640.)

"A court 'enjoys considerable discretion' in determining 'whether to allow [a] late filing of an anti-SLAPP motion.'  [Citation.]  However, the court must exercise this discretion consistent with the purposes of the statute and must be mindful that the 60–day deadline is the general rule." (*San Diegans for Open Government v. Har Construction, Inc.* (2015) 240 Cal.App.4th 611, 624 (*San Diegans for Open Government*).)

"[T]he most important consideration is whether the filing advances the anti-SLAPP statute's purpose of examining the merits of covered lawsuits in the early stages of the proceedings." (*San Diegans for Open Government, supra,* 240 Cal.App.4th at p. 624.)  Accordingly, a trial court may abuse its discretion when "the purpose of the anti-SLAPP statute was not served by the court's consideration of the untimely motion." (*Id.* at p. 626.)  "Other relevant factors include the length of the delay, the reasons for the late filing, and any undue prejudice to the plaintiff." (*Id.* at p. 624.)

1.     Sams's Motion Was Untimely, and the Trial Court Abused Its Discretion in Hearing It

Sams's anti-SLAPP motion was directed at Watson's causes of action for defamation and IIED against Pickett.  Those causes of action were

7

included in the FAC, which Watson served on Pickett on October 28, 2020.[3] Thus, the time for Pickett to file an anti-SLAPP motion expired 60 days later on December 27, 2020. Pickett filed no such motion and instead litigated the matter for over two years prior to his death on February 28, 2023.

When Sams was substituted as Pickett's successor in interest, she "step[ed] into [Pickett's] position as to [this] particular action." (*Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 613, fn. 5.) Sams had "the same rights as [Pickett], with no change in substance." (*Shetty v. HSBC Bank USA, N.A.* (2023) 91 Cal.App.5th 796, 801.) "[T]he successor in interest of a party to an action, if he would appear, must, in making his appearance, occupy the position of his predecessor, and, as succeeding him in the case, must be bound to the same extent to which the predecessor would have been bound had the application been made in his behalf." (*Corwin v. Bensley* (1872) 43 Cal. 253, 259.)[4]

Consequently, because the statutory deadline for Pickett to file an anti-SLAPP motion had passed, that deadline had likewise passed for Sams as Pickett's successor in interest. Thus, we must determine if the trial court's allowance of Sams's late motion was within its discretion.

In *San Diegans for Open Government*, a different panel of this court considered whether a party's change from defendant to real party in interest warranted an untimely anti-SLAPP motion; the court found that it did not

---

[3]     We presume the FAC was the first pleading served on Pickett containing the defamation and IIED causes of action because Watson's initial complaint is not in the record and Watson does not contend otherwise.

[4]     Contrary to Sams's claims, these principles are not limited to contractual rights. (See, e.g., *Serra Canyon Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 669 [successors in interest bound by predecessor's failure to timely seek writ review].)

because the change in party status had no effect on the allegations against that party or its substantive liability. (*San Diegans for Open Government, supra,* 240 Cal.App.4th at p. 625.)

A similar analysis applies here. Sam's substitution does not affect Watson's factual allegations against Pickett or the elements that Watson must prove to prevail on his defamation and IIED claims. Whether Watson's lawsuit is meritless and threatens free speech, which is the target of the anti-SLAPP statute, is not related to Sams's participation in the proceeding. The only material difference is that Watson is no longer able to recover punitive damages. (§ 377.42) But the unavailability of those damages is irrelevant to whether Sams is entitled to anti-SLAPP relief and therefore more appropriately addressed in a motion to strike. (§ 436.) Accordingly, Sam's substitution was not a substantive change for purposes of anti-SLAPP relief.

Further, "[a]n anti-SLAPP motion is not a vehicle for a defendant to obtain a dismissal of claims in the middle of litigation; it is a procedural device to prevent costly, unmeritorious litigation at the initiation of the lawsuit. When a case has been pending long after the 60–day period, the parties have presumably engaged in pretrial litigation and the purposes of an anti-SLAPP motion are no longer applicable." (*San Diegans for Open Government, supra,* 240 Cal.App.4th at pp. 625–626.)

Here, the case was pending for three years by the time Sams filed her motion. During that time, the parties exchanged several rounds of discovery, Pickett filed four motions to compel discovery and a motion for judgment on the pleadings, and the parties participated in multiple trial setting conferences, with trial being set and subsequently vacated. "[T]his lengthy delay was contrary to the anti-SLAPP statute's fundamental purpose." (*San Diegans for Open Government, supra,* 240 Cal.App.4th at p. 624.) "At that

9

point, the parties were free to bring other dispositive motions (e.g., a motion for summary judgment or judgment on the pleadings), but the procedurally complex anti-SLAPP statutory scheme was no longer applicable." (*Id*. at p. 626.)

Under the circumstances of this case, "the purpose of the anti-SLAPP statute was not served by the court's consideration of the untimely motion." (*San Diegans for Open Government, supra,* 240 Cal.App.4th at p. 626.) The trial court therefore abused its discretion in considering Sams's motion, and the order granting that motion must be reversed.

We note that in her respondent's brief, Sams argues that she was improperly substituted as Pickett's successor in interest. Even if that claim could have been properly raised in Sams's anti-SLAPP motion, we do not consider it because the anti-SLAPP motion should have been denied at the outset as untimely. However, Sams raised this issue in a demurrer that she filed concurrently with her anti-SLAPP motion. The trial court did not consider that demurrer regarding the defamation and IIED causes of action based on its granting of the anti-SLAPP motion. Therefore, on remand, the trial court shall consider Sams's demurrer to the defamation and IIED causes of action.

2.      Noda's Motion Was Timely

10

Watson filed a proof of service indicating that he served the FACC on Noda by substitute service on February 18, 2022.[5] Watson then requested entry of default when a timely answer was not filed. On January 11, 2023, Noda filed a motion to quash service of the FACC. The next day, Watson offered to withdraw his request for default and give Noda 30 days to "file responsive pleadings and/or an answer." Noda agreed to accept service of the FACC as of January 13, 2023, to "file a responsive pleading by February 14, 2023," and to take his motion to quash off calendar. Noda then filed his anti-SLAPP motion March 14, 2023.

Watson argues that whether we use the February 18, 2022, date of substitute service or the February 14, 2023, date on which Noda agreed to file a responsive pleading, Noda's anti-SLAPP motion was untimely.

We decline to calculate the motion's deadline from the date of substitute service. The validity of that service was in dispute and resolved by an agreement of the parties. We therefore look to the terms of the parties' agreement to determine timeliness.

The parties agreed service was effective on January 13, 2023, and the deadline for a "responsive pleading" was February 14, 2023. "The pleadings allowed in civil actions are complaints, demurrers, answers, and cross-complaints." (§ 422.10; see also, *Jones v. Goodman* (2020) 57 Cal.App.5th 521, 542, fn. 23 ["A motion is not a complaint, or any other type of pleading."].) As such, an anti-SLAPP motion is not a pleading, so the February 14, 2023 deadline did not apply to such a motion. Instead, the

---

[5] We presume the FACC was the first pleading served on Noda containing the defamation and IIED causes of action because Watson's initial cross-complaint is not in the record and Watson does not argue otherwise.

statutory 60-day deadline applied, and the motion was filed on March 14, 2023, which was 60 days after the January 13, 2023, date of service. Noda's motion was therefore timely.

C.    *The Trial Court Erred in Finding that the FACC's Causes of Action for Defamation and IIED Arose from Protected Activity Under Section 425.16*

1.    Noda's Arguments

Noda argues that his conduct challenged in the defamation and IIED causes of action in the FACC fall under subdivision (e)(3) and (4) of section 425.16. He claims his statements related to Montara's management and finances. Noda also asserts that his statements were made in connection with an ongoing dispute because he was attempting to dissuade Montara members from pursuing collection actions, including the one against Pickett.

2.    "Public Issue" and "Issue of Public Interest" Under Section 425.16

Section 425.16, subdivision (e)(3) applies to statements "in connection with an issue of public interest," while subdivision (e)(4) applies to conduct "in connection with a public issue or an issue of public interest." The statute does not define "public issue" or "issue of public interest." There is no substantive difference between these phrases, and they are used interchangeably. (See, e.g., *Dubac v. Itkoff* (2024) 101 Cal.App.5th 540, 548 (*Dubac*); *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.)

In determining whether something is an issue of public interest, who is affected matters. (See, e.g., *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1248 [public issue generally involves " 'conduct that could directly affect a large number of people beyond the direct participants' "]; *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 [ "a matter of public interest should be something

12

of concern to a substantial number of people," not just "to the speaker and a relatively small, specific audience"].)

For example, in *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 916–917, 924 (*Rivero*), a supervisor of eight janitors sued a union for defamation after the union published claims of the supervisor's misconduct. The court determined that the circumstances were "hardly a matter of public interest" because "the only individuals directly involved in and affected by the situation were [the supervisor] and the eight custodians." (*Id.* at p. 924.)

Other relevant factors in the public issue inquiry include "whether the subject of the speech or activity 'was a person or entity in the public eye,' " "whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' " or " 'affect[ed] a community in a manner similar to that of a governmental entity,' " (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145-146), and whether the issue "has 'been the subject of extensive media coverage' " (*Geiser v. Kuhns, supra,* 13 Cal.5th at p. 1248).

Applying these principles, numerous cases have addressed the meaning of "public issue" in the context of HOA's. On the one hand, "[c]ase law rejects the notion . . . that every issue within a homeowners association is a public issue." (*Dubac, supra,* 101 Cal.App.5th at p. 552; see, e.g., *Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676, 679, 684 [finding § 425.16, subd. (e)(4) inapplicable because the dispute pertained to "the interaction between homeowners and a homeowners association with respect to the homeowners' desired improvements," and did "not involve board elections, recall campaigns, or who should be the manager of the homeowners association"].)

13

On the other hand, a dispute might involve a public issue when the underlying conduct involves governance of a large HOA. (See, e.g., *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [homeowners' allegedly defamatory statements about HOA's former manager and how HOA should be managed were protected activity because "the statements were made in connection with . . . [b]oard elections and recall campaigns" and "concerned the very manner in which this group of more than 3,000 individuals would be governed—an inherently political question of vital importance to each individual and to the community as a whole"]; *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1470 [allegedly libelous statements about the board's governance and enforcement of rules in HOA of more than 500 members were protected because those topics were "issues of concern to the many [HOA] members"]; *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 125, 132–133 [homeowner's invocation of tree-trimming dispute resolution process was protected activity because HOA's authority to enforce tree-trimming covenants for 755 lots was of interest to entire HOA].)

The public issue determinations in these HOA cases were based in part on the reality that HOA's are quasi-governmental entities. (See, e.g., *Damon v. Ocean Hills Journalism Club, supra,* 85 Cal.App.4th at pp. 475, 479–480.) However, that factor becomes less significant as the size of the HOA decreases. For example, in *Dubac*, an HOA governed a six-unit building. (*Dubac*, *supra*, 101 Cal.App.5th at p. 543.) Two owners allegedly defamed another (Dubac) in statements to the HOA's board, other residents, an insurance carrier, land use consultants, the building manager, and a city planning official. (*Id*. at pp. 543–547.) Those statements included complaints

14

that the HOA was being mismanaged and that Dubac was not fit to be a board member. (*Ibid.*)

The *Dubac* court determined that no public interest was involved because "[t]he number of people affected by, involved in, or who care about this intrabuilding name calling [was] minute," and it was "[a] matter of concern to the speaker and a relatively small, specific audience." (*Dubac, supra,* 101 Cal.App.5th at pp. 554–555.) The court explained the interplay between the size of an HOA and its government-like status:

> Homeowners associations in some sense are the opposite of "public": they are intensely private; you must buy your way in, often at high cost, to a place that excludes the general public. The point of the organization is to exercise control over private property to which the public has no right of access.
>
> But any kind of collective governance can call forth another notion of "public," which is that *group* control differs from strictly *individual* power. Homeowners associations can be a type of small-scale democracy, where people meet in something like a town hall and, through discussion and voting, settle differences and decide their collective fate. This has a sort of "public" aspect.
>
> This aspect, however, suffers a problem. All "private" organizations govern themselves in some collective way: clubs, hobby groups, sports teams, and so on. Every bridge foursome and chess club has *some* way to decide when and where to meet, whom to include, and what rules to follow. Is all this private ordering and governance really "public"? To read "public" so broadly would tend to make most things "private" into something "public." And expanding "public" to include every bridge group would tend to drain all content from a word of limitation. This method of statutory interpretation is unsound. (*Dubac, supra,* 101 Cal.App.5th at pp. 551–552.)

15

3.    Analysis

Starting with the obvious, nothing in the record suggests Watson was in the public eye or that the disputes between the Montara owners received any media coverage.  As such, those potential avenues for classifying this matter as an issue of public concern are not available.

This case does bear some similarities to published cases which found HOA activity included public issues.  For instance, here Noda's alleged statements accused Watson of mismanaging association finances at a time when Watson and Pickett were embroiled in litigation over governance of Montara and the propriety of expending and collecting association funds.

However, we find the size of Montara's membership to be a significant and distinguishing factor.  Although the association had 36 potential residences, there were only 13 owners of those residences.  And while the record indicates that an unknown number of those residences were occupied by tenants, there is no indication that those tenants, or anyone else outside the association's membership, cared about the dispute.  To the extent the tenants may have been intrigued, " 'public interest' does not equate with mere curiosity."  (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at p. 1132.) More importantly, tenants had no ownership interest in the Montara, no obligation to pay or right to enforce assessments, and no ability to participate in association affairs.  Accordingly, the tenants were not " 'directly affect[ed]' " by, or " 'direct participants' " (*Geiser v. Kuhns, supra,* 13 Cal.5th at p. 1248) in this member-only dispute.

Because we are dealing with matters concerning 13 owners, this case is akin to the six-unit building in *Dubac* and the nine individuals involved in *Rivero*.  "[T]he only individuals directly involved in and affected by the situation were [Watson] and the [other 12 owners]."  (*Rivero, supra,*

16

105 Cal.App.4th at p. 924.)  Noda's allegedly defamatory statements merely concerned  "the speaker and a relatively small, specific audience." (*Dubac*, *supra*, 101 Cal.App.5th at p. 555.)

A matter involving such a small group is not a "public issue" or "issue of public interest" under section 425.16, subdivision (e).  Finding otherwise would impermissibly expand the plain terms of the statute.  Accordingly, the trial court should have denied Noda's anti-SLAPP motion at the first prong.

## IV. DISPOSITION

The order is reversed.  We remand the matter for proceedings consistent with this opinion, including a hearing on Sams's demurrer to the defamation and IIED causes of action.  Watson is awarded costs on appeal.


RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.


17